In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2293

Alliant Energy Corporation and Wisconsin Power
and Light Company,

Plaintiffs-Appellants,

v.
Ave M. Bie, Joseph P. Mettner, and John H.
Farrow, in their official capacities as
Commissioners of the Wisconsin Public
Service Commission,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00-C-611-S--John C. Shabaz, Judge.

Argued November 13, 2001--Decided January 17, 2002

   Before Harlington Wood, Jr., Easterbrook,
and Kanne, Circuit Judges.

   Easterbrook, Circuit Judge.  Wisconsin
regulates the corporate structure of
firms that provide utility service in
that state. Some of these regulations,
according to our plaintiffs (an electric
utility and its parent),
unconstitutionally discriminate against
interstate commerce and deprive them of
the laws' equal protection. Compare Edgar
v. MITE Corp., 457 U.S. 624, 643-46
(1982), with Amanda Acquisition Corp. v.
Universal Foods Corp., 877 F.2d 496 (7th
Cir. 1989). Plaintiffs, who have sued
under 42 U.S.C. sec.1983, want an
injunction blocking these statutes'
enforcement. But the district court did
not adjudicate the plaintiffs'
contentions. Instead it dismissed the
complaint for lack of standing, ruling
that the complaint did not spell out in
enough factual detail the proposed
actions that state law would block. We
hold, to the contrary, that the complaint
satisfies Fed. R. Civ. P. 8. Perhaps the
plaintiffs will be unable to prove their
allegations of injury, but they are
entitled to try.

   Wisconsin Power & Light Co. (wpl) is the

utility, and Alliant Energy the parent holding company. One of the laws in question requires Alliant (and any other corporation owning as little as 5% of a Wisconsin utility such as wpl, or of a holding company such as Alliant) to be incorporated in Wisconsin. Wis. Stat. sec.196.795(1)(h)1, (5)(l). The utility itself must be incorporated in Wisconsin. Wis. Stat. sec.196.53. A third law prevents any holding company in Alliant's position from selling as little as 10% of its stock to a single person without prior administrative approval, Wis. Stat. sec.196.795(3). A fourth blocks any utility holding company from investing more than 25% of its assets outside the utility sector. Wis. Stat. sec.196.795(6m)(b). There are more, but because standing to sue is the only open question we need not mention them. The first amended complaint asserted in general terms that these statutes injure Alliant and wpl by preventing them from reincorporating outside Wisconsin, selling blocs of stock to non-Wisconsin firms in order to raise capital at lower rates, and diversifying their business outside the utility sector by more than the 25% cap. The district court deemed this inadequate because it did not allege that Alliant and wpl have firm commitments to do any of these forbidden things and did not spell out exactly what harm they suffer from not being able to do them. Plaintiffs then sought to file a second amended complaint, accompanied by affidavits of both managers and economists, stating expressly (for example) that Alliant would incorporate outside Wisconsin, if doing so were prudent after the district judge's ruling, would sell more than 10% of its stock to raise investment capital, and would make higher profits if it could engage in these and other transactions forbidden by the challenged laws. Thedistrict judge refused to allow this amendment, ruling that it would be pointless because it would not solve the problem. Neither the second amended complaint nor any affidavit identifies a buyer (and price) for the stock that Alliant would like to sell, identifies a partner committed to a merger, or makes an unqualified commitment to reincorporate in a particular state outside Wisconsin. Injury thus is conjectural, the judge wrote.

Reading plaintiffs' papers leaves us, like the district judge, wondering whether there is a concrete dispute. It would be easy enough for Alliant to say something like: "As soon as the law allows, we will reincorporate in Delaware." And if Alliant fears that this is imprudent (because Delaware might change its laws while this case is pending), Alliant could say something like: "The Board of Directors has passed a resolution committing this firm to reincorporate in Delaware, provided that the shareholders approve and provided further that provision X of Delaware law has not changed in the interim." From the nature of this suit, in which plaintiffs protest the unusually stringent anti-takeover rules of Wisconsin law (even the anti-minority-bloc rules), the reservation about Delaware law might read something like "provided further that Delaware law still freely allows sales of minority blocs and the purchase of shares by third parties." But Alliant has not said anything of the sort. The amended complaint and accompanying affidavits just say "we want to reincorporate," without identifying the proposed state of reincorporation, the reason why that state's law is preferable to Wisconsin's, or any contingencies that would affect the choice. The maddening vagueness of the complaint, and the fact Alliant and wpl haven't committed themselves to do anything, implies that maybe the state laws aren't really blocking them from do ing what they would prefer to do.

Both in their brief and at oral argument plaintiffs insisted that this standoffish position is compelled by the directors' fiduciary duties. It would be imprudent, counsel insist, for the directors to make commitments when the litigation might linger on the docket and business or legal circumstances change. "The business judgment rule," plaintiffs' brief says, prevents the directors from making firm plans. This confuses a defense to liability with a rule of conduct. The business judgment rule is a defense; if directors act loyally and carefully, they are not liable even if the transaction goes awry. See, e.g., E. Norman Veasey, Seeking a Safe Harbor from Judicial Scrutiny of Directors' Business Decisions, 37 Bus. Law. 1247 (1982). The rule of conduct is that directors must try to maximize investors' expected

returns. If doing this requires the directors and managers to make long-term commitments, then they are required to do so. Firms cannot operate only in the short term. wpl knows this. It may take 20 years to design, get approval for, and build a new power plant. During that time the price of fuel, the demand for power, and the environmental regulations that affect the plant's operation may change, for the better or the worse. What seemed profitable at the outset may turn out to be a losing venture. Yet directors who refuse to make long-term plans, because they fear loss, are doing the investors a disservice. Investors can cope with project-specific and firm-specific risk easily by holding a portfolio of stocks; some investments will be winners, some losers. Directors who refuse to make long-term commitments because they dread loss end up ensuring loss. So if directors believe that being rid of Wisconsin's laws would improve Alliant's or wpl's profitability, and if because of standing rules the only way to get an adjudication and a crack at liberation from the laws is to make a long-term commitment, then the directors are not just allowed by corporate law to make that pledge but also required to do so if they believe that step a paying venture on balance. The plaintiffs' excuses for filing mealy-mouthed documents just do not wash.

All of this assumes, however, that the district judge was right in thinking that it is legally essential that such commitments be part of the complaint. It is not. A complaint need only state the nature of the claim; details can wait for later stages, such as an evidentiary hearing under Fed. R. Civ. P. 12(b)(1) or summary judgment under Rule 56. "Complaints need not be elaborate, and in this respect injury (and thus standing) is no different from any other matter that may be alleged generally. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)." South Austin Coalition Community Council v. SBC Communications Inc., No. 00-3864 (7th Cir. Dec. 19, 2001), slip op. 3; see also Alliance for Clean Coal v. Miller, 44 F.3d 591 (7th Cir. 1995). The Supreme Court elaborated in Lujan:

The party invoking federal jurisdiction bears the burden of

establishing these elements. See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990); Warth, supra, at 508. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. See Lujan v. National Wildlife Federation, 497 U.S. 871, 883-889 (1990); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 114-115, and n. 31 (1979); Simon, supra, at 45, n. 25; Warth, supra, at 527, and n. 6 (Brennan, J., dissenting). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." National Wildlife Federation, supra, at 889. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." Gladstone, supra, at 115, n. 31.

504 U.S. at 561. "[G]eneral factual allegations", which suffice at the pleading stage, are exactly what Alliant provided. It plans to reincorporate outside Wisconsin, wants to sell more stock to investors not incorporated in Wisconsin, and so on. Details-- reincorporate where? when? sell to whom?- -can come later. The extra detail provided with the proposed second amended complaint and affidavits does not plead the case out of court. These documents do not show that the case is doomed. They just leave things open; too open, the district judge thought, but supplying details is not the function of a complaint. It is easy to imagine facts

consistent with this complaint and affidavits that will show plaintiffs' standing, and no more is required. See, e.g., Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Walker v. National Recovery, Inc., 200 F.3d 500 (7th Cir. 1999); Bennett v. Schmidt, 153 F.3d 516 (7th Cir. 1998).

Moreover, because investors' loss is derivative from corporate loss, the fact that investors (and potential buyers or merger partners) have not sued is not fatal. The market price of stock reflects anticipated corporate profits (plus liquidation value). Plaintiffs say that their costs of raising capital will fall if they can avoid the challenged state statutes. Higher costs of capital injure the firm, making Alliant and wpl the right plaintiffs. See Frank v. Hadesman & Frank, Inc., 83 F.3d 158, 160 (7th Cir. 1996); Kagan v. Edison Brothers Stores, Inc., 907 F.2d 690 (7th Cir. 1990); Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379 (7th Cir. 1990); Twoy v. First National Bank of Chicago, 758 F.2d 1185, 1194 (7th Cir. 1985); Johnson v. Ingersoll, 63 F.2d 86 (7th Cir. 1933). (We have not overlooked the possibility that Wisconsin uses an abnormal distinction between direct and derivative standing in corporate transactions, so that events raising corporations' costs of capital would produce claims owned by the investors, but the parties have not cited any statute or case to that effect, and none has turned up in our search.) Alliant and wpl will need to prove their contention that these statutes raise the costs of hiring capital; otherwise the laws cannot hamper interstate commerce. In this respect standing merges into the merits. But, as we have said, at this stage allegations are enough. Skepticism about a plaintiff's ability to prove its claims is not a reason to dismiss a pleading, however. It is at most a reason to hold a hearing and require the plaintiff to pony up the proof.

Some of the proof should be easy to come by--if the plaintiffs are serious about having business plans with which these statutes interfere. The board need only make the sort of commitment we have described. Proof that the rule requiring regulatory approval to sell a 10% bloc, or forbidding diversification, hampers

plans (or raises the cost of capital, if it does) may be harder to come by. Potential investors may be unwilling to identify themselves; sometimes the value of a business transaction is enhanced by confidentiality while negotiations proceed, lest a premature announcement give valuable information to one's rivals. See Flamm v. Eberstadt, 814 F.2d 1169 (7th Cir. 1987); Alan Schwartz, The Fairness of Tender Offer Prices in Utilitarian Theory, 17 J. Legal Studies 165 (1988). But the difficulty of identifying particular transactions is not fatal, as we held in Alliance for Clean Coal, 44 F.3d at 594-95. A statute that deprives a firm of an opportunity to compete for business gives standing to sue, without need for proof that the firm would have won the competition or made a profit in the process. See Northeastern Florida Contractors v. Jacksonville, 508 U.S. 656 (1993); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210-12 (1995). The 10% and 25% limits interfere with the competition for capital. An economist would say that they deprive the firm of an option value--that is, of the power to sell a 10% bloc (or diversify, with or without a merger) in the event that step should prove to be profitable. The principle is the same as the loss-of-a-chance approach to measuring damages in tort law. See Doll v. Brown, 75 F.3d 1200 (7th Cir. 1996).

Suppose that there is only a 10% chance that the firm would be able to attract an investor willing to buy a 10% bloc of stock in the next year at a price that is attractive to the firm, but that if such a buyer can be found the firm will save $1 million compared with the outlay in hiring the same capital from banks. Then the loss from not having the option to make the placement is $100,000, and this loss affords standing. When financial markets are volatile, the option to make a placement is worth even more. This is one of the principal conclusions of the Black-Scholes option pricing theorem, which today lies at the core of many financial markets, such as those in puts, calls, and other forms of options. See generally Hans R. Stoll & Robert E. Whaley, Futures and Options (1993); Frank J. Fabozzi & Franco Modigliani, Capital Markets: Institutions and Instruments (1992); Myron S. Scholes, Global Financial Markets, Derivative Securities,

and Systemic Risks, 12 J. Risk & Uncertainty 271 (1996); Roberta Romano, A Thumbnail Sketch of Derivative Securities and Their Regulation, 55 Md. L. Rev. 1 (1996). A call--that is, a right to buy stock in the future at a price fixed today--will sell for a positive price even if it is out of the money (for example, a right to buy IBM stock for $100 per share during the next 90 days may sell for $5 today, even if IBM is trading at $90). The more volatile the market, the more likely the stock is to rise above the option's strike price and thus produce a profit. So too with options such as a right to sell 10% of one's stock. This has a positive value even if no one wants to buy today. A firm with the ability to sell such blocs in the future, when conditions change, is worth more in the market today than a firm hamstrung by laws cutting off its opportunities. This difference in value supplies standing.

As we have said, plaintiffs may fail in their proof; if, for example, Wisconsin has a system of rate regulation so airtight that any savings in the capital markets are passed through to consumers in lower rates, then plaintiffs would not suffer injury even in this option-value sense. But passing-on is a defense, not something the complaint must negate, and is so hard to prove that elsewhere in the law it is disregarded, even for regulated utilities. Kansas v. Utilicorp United Inc., 497 U.S. 199 (1990). At all events, these and other complexities must await further development in the district court.

Reversed and Remanded