# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2461
_____

| | | |
|---|---|---|
| Southern Union Company, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Missouri Public Service | * | Western District of Missouri. |
| Commission, et al., | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: December 10, 2001

Filed: May 6, 2002
_____

Before LOKEN and BYE, Circuit Judges, and BOGUE,[*] District Judge.
_____

LOKEN, Circuit Judge.

Since 1913, Missouri has required public utilities conducting business in the State to receive prior approval from the Missouri Public Service Commission before purchasing stocks or bonds issued by another utility. See MO. REV. STAT. § 393.190.2. In this case, Southern Union Company applied to the Commission for blanket approval to make non-controlling investments in utilities that do not operate

_____

[*]The HONORABLE ANDREW W. BOGUE, United States District Judge for the District of South Dakota, sitting by designation.

in Missouri. Following an evidentiary hearing, the Commission denied the application, concluding that it may not grant blanket approvals, and alternatively that the approval sought would be detrimental to the public interest. Southern Union then filed this action against the Commission and individual Commissioners under 42 U.S.C. § 1983, seeking a declaratory judgment that § 393.190.2 violates the Commerce Clause and impermissibly conflicts with federal statutes. The district court[1] granted summary judgment in favor of defendants, concluding the Missouri statute does not violate the Commerce Clause and is not preempted by federal law. Southern Union appeals, challenging only the district court's Commerce Clause ruling. Reviewing that decision *de novo*, we affirm.

## I. Background.

Southern Union is a Delaware corporation having its principal office in Austin, Texas. Through its Missouri Gas Energy division, Southern Union provides natural gas service to over 480,000 customers in central and western Missouri. Southern Union is subject to the Commission's regulatory authority, see MO. REV. STAT. §§ 393.110 to 393.295, including the requirement in § 393.190.2 that a regulated gas corporation must obtain the Commission's prior approval before acquiring the securities of another utility, whether or not the other utility operates in Missouri.

Southern Union filed the application at issue in April 1998. The application stated that Southern Union "has had the goal of selected growth and expansion within the utilities industry, including by acquiring other energy distribution or transmission businesses," that "very few states have a provision as restrictive as" § 393.190.2, and that "an acquisitive company . . . like Southern Union . . . must be able to make investment decisions quickly, and in some instances, quietly." Southern Union requested a five-year blanket approval to make investments in utility companies that

---

[1]The HONORABLE NANETTE K. LAUGHREY, United States District Judge for the Western District of Missouri.

do not operate in Missouri, provided the investments do not exceed in the aggregate $50,000,000 and would not cause Southern Union to hold more than ten percent of the voting securities of another utility. Southern Union promised to maintain records of all such transactions and to provide the Commission with copies of any filings with other regulatory agencies, such as the federal Securities and Exchange Commission. Following a hearing, the Commission denied the application in August 1999. The Commission first determined that it does not have authority to grant blanket approvals, that is, it may not permit Southern Union "to enter into stock acquisitions in which the time, the target, the price, and the financing terms are all unknown." The Commission then determined that the requested blanket approval was not in the public interest because "even with subsequent rate case review, a significant potential exists that Missouri ratepayers could be harmed" by investment losses.

Southern Union then commenced this action, alleging that § 393.190.2 as interpreted by the Commission violates the Commerce Clause and is preempted by the federal securities laws or by the Public Utility Holding Company Act of 1935, 15 U.S.C. §§ 79 to 79z-6. In addition, invoking the district court's supplemental jurisdiction, Southern Union alleged that the Commission's denial was unlawful and unreasonable under Missouri law. See MO. REV. STAT. § 386.510 (authorizing judicial review of Commission decisions). In March 2001, the district court granted summary judgment rejecting Southern Union's federal claims. Southern Union Co. v. Missouri Pub. Serv. Comm'n, 138 F. Supp. 2d 1201, 1206-10 (W.D. Mo. 2001). Two months later, the court issued an order abstaining from deciding the state law claim and remanding that claim to state court. This appeal followed.

With this appeal pending, the state trial court ruled on remand that the Commission may issue the requested blanket approval, and that Southern Union's application was unreasonably and unlawfully denied on the merits. However, on March 22, 2002, the court granted the Commission's motion to vacate that judgment and dismissed Southern Union's petition for review. Before this court, the

-3-

Commission continues to assert that its pre-approval authority is constitutional. The order denying Southern Union's application has not been overturned by the state courts. Thus, the issue before this court -- whether § 393.190.2 as applied is valid under the Commerce Clause -- is not moot.[2]

## II. Discussion.

The Commerce Clause of the United States Constitution authorizes Congress "[t]o regulate Commerce . . . among the several States." Art. I, § 8, cl. 3. In addition, "[t]he negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." General Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997) (citations and quotation omitted). As the district court explained, "the scrutiny to which a State statute is subject depends on whether its impact on interstate commerce is direct and substantial and is designed to obtain an economic advantage for the State at the expense of its sister States." 138 F. Supp. 2d at 1206. Accordingly, "regulations designed to further economic protectionism" are presumptively invalid. Middle South Energy, Inc. v.

---

[2]Effective July 1, 2001, the Missouri Legislature amended the State's Business Corporations Act to provide that "no foreign corporation doing business in this state shall be required to obtain prior approval of any state agency to acquire . . . the stock or bonds of another foreign corporation . . . which does not conduct business in this state." MO. REV. STAT. § 351.608. The plain language of this new statute seems to grant Southern Union, a foreign corporation doing business in Missouri, the right to invest in foreign utilities without seeking the Commission's prior approval. However, on remand from the district court, the state trial court ruled, in the order it later vacated, that § 351.608 "does not apply to the Commission." The court did not explain its ruling, and this issue of state law remains unresolved. The issue was not raised in the district court and has not been briefed or argued on appeal. Whatever the meaning of the new statute, it does not render our case moot because the Commission's order denying Southern Union's application for blanket approval remains in effect.

Arkansas Pub. Serv. Comm'n, 772 F.2d 404, 416 (8th Cir. 1985). On the other hand, when a statute "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

Southern Union argues that § 393.190.2 violates the Commerce Clause by regulating interstate stock transactions that occur entirely outside Missouri. Using terminology from some of the Supreme Court's Commerce Clause opinions, Southern Union asserts that § 393.190.2 is per se invalid because it is both "extraterritorial" and "direct" regulation of interstate commerce. Southern Union cites no authority supporting this contention in the context of public utility regulation. If § 393.190.2 were so obviously unconstitutional, it is startling , to say the least, that the statute has gone unchallenged for nearly one hundred years.

Southern Union's argument ignores this nation's long history of public utility regulation. For over fifty years, Congress has regulated the interstate transmission of natural gas (the Natural Gas Act), the interstate transmission of electric power (the Federal Power Act), and the ownership of utilities (the Public Utility Holding Company Act of 1935). A major purpose of these laws was to preserve and protect state and local regulation of the distribution of natural gas and electricity to local retail customers. See, e.g., General Motors v. Tracy, 519 U.S. at 288-97; Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n of Ind., 332 U.S. 507, 517-24 (1947).

The statute here at issue is part of Chapter 393 of the Missouri Statutes, which authorizes the Commission to establish "just and reasonable" rates for the local distribution of natural gas, electricity, water, and sewer services. Rate regulation is a complex process. A public utility's investments in other companies can affect its regulated rate of return, if investment losses are allocated to the regulated business. Transactions between affiliated utilities can present rate regulators with difficult

issues of preferential treatment and cost allocation. The abuses Congress identified in enacting the Public Utility Holding Company Act attest to the long-standing regulatory concern over interlocking ownership and management of public utilities. See North Am. Co. v. SEC, 327 U.S. 686, 701-02 & n.11 (1946). This concern does not mean that Southern Union's acquisition strategy is necessarily contrary to the public interest, but it tends to confirm the presumptive validity of Missouri regulating that strategy by requiring pre-acquisition approval.

The Commission asserts that § 393.190.2 is part of its rate regulation responsibilities. Southern Union does not deny that assertion, and the administrative record in this proceeding supports it. For this reason, Southern Union's contention that this is merely "extraterritorial" regulation of interstate commerce is incorrect. Though Southern Union's stock purchases are no doubt conducted from its corporate headquarters in Texas, the Commission scrutinizes these transactions because they potentially affect the company's regulated rate of return in Missouri. Thus, § 393.190.2 regulates interstate stock purchases because of their impact on Southern Union's regulated local activities in Missouri. Likewise, calling this "direct" regulation of interstate commerce does not make it per se unlawful. As the Fourth Circuit observed in Baltimore Gas & Elec. Co. v. Heintz, 760 F.2d 1408, 1421 (4th Cir. 1985), the direct/indirect distinction is not analytically helpful when a state statute regulates interstate stock transactions for the purpose of protecting local consumers from public utility abuses.

In its recent Commerce Clause decisions, the Supreme Court has limited its per se rule of invalidity "to provisions that patently discriminate against interstate trade." Associated Indus. of Mo. v. Lohman, 511 U.S. 641, 647 (1994). "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." C & A Carbone, Inc. v. Town of Clarkston, 511 U.S. 383, 390 (1994); see United Waste Sys. of Iowa,

Inc. v. Wilson, 189 F.3d 762, 767 (8th Cir. 1999). Here, no discrimination against interstate commerce, or other form of "economic protectionism," is at work, as it was in the Commerce Clause cases upon which Southern Union primarily relies -- Healy v. The Beer Inst., Inc., 491 U.S. 324, 340-41 (1989), Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 579-80 (1986), New England Power Co. v. New Hampshire, 455 U.S. 331, 338-39 (1982), and Middle South, 772 F.2d at 416. All regulated utilities doing business in Missouri are subject to the prior approval requirements of § 393.190.2, and Commission approval is required for purchases of stock issued by Missouri utilities as well as by out-of-state utilities. This is regulation of a local public utility for the protection of local Missouri ratepayers. For these reasons, we reject Southern Union's theories of per se invalidity.

Southern Union next argues that § 393.190.2 violates the Commerce Clause under the Pike balancing test. That test requires balancing a legitimate local public interest against its incidental burden on interstate commerce. On the issue of Missouri's public interest, the Supreme Court has stated that "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 377 (1983). If anything, Missouri's interest in assuring a reliable and affordable supply of natural gas for its citizens is stronger than a State's interest in regulating the corporate governance of its domestic corporations, an interest that was sufficient to uphold the Indiana Control Shares Acquisition Act against a Commerce Clause challenge in CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 94 (1987). Moreover, the long history of utility rate regulation in this country establishes that Missouri has a legitimate interest in protecting local ratepayers by regulating the corporate structure of utility companies. See Baltimore Gas, 760 F.2d at 1424-25.

When we turn to the second part of the Pike balancing test, the burden § 393.190.2 places on interstate commerce, we are hampered by the non-specific nature of Southern Union's application for blanket approval. Southern Union

generally asserts that it takes time and money to obtain prior Commission approval, which is no doubt true. But its further assertion that "Defendants block interstate transactions by refusing to authorize Southern Union's investments in non-Missouri Utilities" is not supported, either by the denial of a specific investment in this case, or by a review of prior decisions showing that the Commission regularly frustrates non-control investments in non-Missouri utilities. While we are not certain the district court accurately described the burden on interstate commerce as "minimal," we cannot conclude on this record that it is substantial.

Similarly, when we come to apply the Pike balancing test, we are hampered by the non-specific nature of the Commission's decision in this case. Its rationale for denying Southern Union's blanket approval application on the merits -- stock purchases may result in investment losses -- might be too general to justify a ruling that severely crippled a specific interstate securities transaction with no showing that the ruling was essential to effective rate regulation. Cf. Edgar v. MITE Corp, 457 U.S. 624, 643-46 (1982). But as Southern Union presented no specific transaction for approval, the Commission had no occasion to explain in greater detail how its prior approval authority complements its regulation of utility rates. Thus, the bare record before us precludes the kind of detailed analysis the Supreme Court requires before invalidating a state law under the Commerce Clause.

Section 393.190.2 is part of a complex regime for the regulation of public utilities in Missouri. Recognizing that local public utility rate regulation is presumptively valid, and that the Supreme Court has rarely invoked Pike balancing

to invalidate state regulation under the Commerce Clause, we conclude that Southern Union has failed to meet its substantial burden to prove that the denial of its blanket approval application resulted in an unconstitutional burden on interstate commerce.

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.