In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-2618

ALLIANT ENERGY CORPORATION and
WISCONSIN POWER AND LIGHT COMPANY,

*Plaintiffs-Appellants*,

*v.*

AVE M. BIE, BURNEATTA BRIDGE and ROBERT M.
GARVIN, in their official capacities as Commissioners
of the Wisconsin Public Service Commission,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00 C 0611—**John C. Shabaz**, *Judge*.

ARGUED DECEMBER 4, 2002—DECIDED MAY 29, 2003

Before FLAUM, *Chief Judge,* and COFFEY and WILLIAMS,
*Circuit Judges*.

FLAUM, *Chief Judge.* This case involves various stat-
utes regulating public utilities and public utility holding
companies in Wisconsin. The plaintiffs challenge the
constitutionality of the statutes under the Commerce and
Equal Protection clauses of the United States Constitution.
The district court granted summary judgment in favor of
the defendants. The plaintiffs appeal. For the reasons
stated herein, we affirm in part and reverse in part.

# I.  Background

## i.  The Parties

The plaintiffs in this case are Alliant Energy Corporation ("Alliant") and its subsidiary, Wisconsin Power and Light Company ("WPLC").[1] Alliant is incorporated in Wisconsin and functions as a Wisconsin public utility holding company. Under WIS. STAT. § 196.795 (1)(h)(1)(a) that means that Alliant owns or controls more than 5%—in this case 100%—of the outstanding voting securities in a Wisconsin public utility, namely WPLC, a Wisconsin corporation that provides utility services in Wisconsin. Alliant has two other subsidiaries: Interstate Power and Light Company, which provides utility services in Iowa, Minnesota and Illinois; and Alliant Energy Resources, Inc., which owns Alliant's nonutility holdings. Alliant is subject to regulation by the Minnesota Public Utilities Commission, the Iowa Utilities Board, the Illinois Commerce Commission, the Securities and Exchange Commission, and most relevantly the Wisconsin Public Service Commission ("PSC"). WPLC is also regulated by the PSC.

This is a suit against the PSC (the named defendants in this case, Ave Bie, Burneatta Bridge and Robert M. Garvin, are sued in their official capacities as commissioners of the PSC).

## ii. The Statutory Provisions

There are numerous provisions of Wisconsin law that are challenged in this appeal, and two other provisions that, though unchallenged, are relevant to our analysis. The relevant unchallenged provisions are as follows:

---

[1] For convenience, we will generally refer to the arguments as belonging to Alliant.

**Ch. 180:**[2] This chapter provides the rules for incorporation within Wisconsin. Both Alliant and WPLC are incorporated under ch. 180. Alliant is seeking to reincorporate in another state.

**§ 196.795(2):** This is the section specifically providing for and authorizing the formation of utility holding companies. It is by virtue of this provision that Alliant is authorized to exercise ownership and control over WPLC; to put it another way, without this provision Alliant would not exist at all as a holding company.

The challenged provisions are as follows:

**§ 196.53:** "No license, permit or franchise to own, operate, manage or control any plant or equipment for the production, transmission, delivery or furnishing of heat, light, water or power may be granted or transferred to a foreign corporation [with some exceptions]."

**§ 196.795(5)(L) ("in-state incorporation provision"):** This provision requires that a public utility holding company be incorporated in Wisconsin, under WIS. STAT. CH. 180.

**§ 196.795(3) ("the takeover provision"):** This provision requires PSC approval before a person can acquire more than 10% of the outstanding voting securities of a public utility holding company.

**§ 196.795(6m)(b) ("the asset cap"):** This provision limits the extent to which a public utility holding company may invest in non-utility businesses.

**§§ 196.195(5)(a) and (7)(a), 201.01(2), and 201.03(1) ("the securities regulation provisions"):** These

---

[2] All of the laws listed are Wisconsin statutes and so we list only chapter or section number.

provisions provide that PSC may regulate the issuance of securities by "public service corporations." The provisions also define the application of the term "public service corporations."[3]

The in-state incorporation provision, the takeover provision, the asset cap, and the securities regulation provisions are all part of the Wisconsin Utilities Holding Company Act (WUHCA).

### iii.  The Challenge

Alliant and WPLC challenge the constitutionality of the in-state incorporation provision, the takeover provision, the asset cap, and the securities regulation provisions as well as §196.53. Alliant argues that these provisions violate the Commerce and Equal Protection clauses of the United States Constitution.[4] The district court found that the provisions are not unconstitutional and alternatively that Alliant is estopped from challenging the provisions in the first place. Accordingly, the district court granted summary judgment in favor of the defendants.

---

[3] The definition is broad enough that the PSC might deem Alliant to be a "public service corporation."

[4] The district court originally dismissed the case for lack of standing. In a prior appeal we reversed, holding that if Alliant can show that they intended to make investment purchases and sales in violation of the provisions and to reincorporate outside of Wisconsin, they could establish standing to challenge the provisions. *Alliant Energy Corp. v. Bie*, 277 F.3d 916 (7th Cir. 2002). Alliant has done this and therefore standing is no longer an issue.

**II. Discussion**

Alliant presents its arguments generally as to all chal-
lenged provisions with few distinctions between them. The
issues of this case cannot be meaningfully analyzed in
such a manner. The provisions of the statute have very
different purposes and effects. We therefore deal with the
provisions in three distinct categories: the first category
is simply the in-state incorporation provision requiring
that a holding company be incorporated under Wisconsin
law; the second category is § 196.53, the provision requir-
ing that licenses, permits and franchises for local utilities
not be granted or transferred to foreign corporations;
and the third category is made up of the remaining pro-
visions, which regulate the financial structure and activ-
ities of the holding company (hereinafter "the structural
provisions").

*a. Constitutional Estoppel and Severability*

The district court found that Alliant was estopped
from challenging the constitutionality of the Wisconsin
statutes. The district court reasoned that because Alliant
is authorized to exist as a holding company by virtue of
WUHCA, in provision § 196.795(2), it cannot then chal-
lenge the constitutionality of other parts of the act. The
district court based its holding on *Fahey v. Mallonee*, 332
U.S. 245 (1947). The Supreme Court in *Fahey* explained, "It
is an elementary rule of constitutional law that one may not
retain the benefits of the Act while attacking the con-
stitutionality of one of its important conditions." *Id.* at 255
(quotations and citations omitted). As elementary as the
rule may have been, the "doctrine has unquestionably been
applied unevenly in the past, and observed as often as not
in the breach." *Arnett v. Kennedy*, 416 U.S. 134, 153 (1974);
*accord Brockert v. Skornicka*, 711 F.2d 1376, 1380 (7th Cir.
1983). We therefore view the rule as one to be applied on a

case-by-case basis. *See Kadrmas v. Dickinson Pub. Sch.,* 487 U.S. 450, 456-57 (1988) ("[W]e doubt that plaintiffs are generally forbidden to challenge a statute simply because they are deriving some benefit from it."). It is also important to recognize the close tie between the rule of estoppel and the question of severability of statutory provisions. The question of severability was essential to the decision in *Fahey*:

> In the name and right of the Association it is now being asked that the Act under which it has its existence be struck down in important particulars, hardly severable from those provisions which grant its right to exist. Plaintiffs challenge the constitutional validity of the only provision under which proceedings may be taken to liquidate or conserve the Association for the protection of its members and the public. If it can hold the charter that it obtained under this Act and strike down the provision for terminating its powers or conserving its assets it may perpetually go on, notwithstanding any abuses which its management may perpetuate.

*Fahey*, 332 U.S. at 255-56. As the challenged provision was "hardly severable" from the provision that allowed the plaintiffs in that case to exist, it made sense to estop them from making the challenge. If the plaintiffs were allowed to challenge a non-severable provision, the result would be strange indeed—a victorious plaintiff would have litigated itself out of existence.

The defendants argue that the challenged provisions, as part of WUHCA, are not severable from the other provisions of that act, especially WIS. STAT. § 196.795(2), the provision under which Alliant is authorized to exist as a holding company. In making this argument the plaintiffs must overcome the presumption in Wisconsin of severability of statutory provisions. Wisconsin Statute § 990.001(11) provides,

> The provisions of the statutes are severable. The provisions of any session law are severable. If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application.

This presumption can only be overcome by showing that the legislature, intending the statute to be effective only as an entirety, would not have enacted the valid part of the statute by itself. *State v. Hezzie R.*, 219 Wis. 2d 848, 863-66 (1998).

The merit of the defendants' argument that the provisions are not severable from § 196.795(2) is different for each of the three categories of challenged provisions. For the group we refer to as the structural provisions the defendants have a strong argument. These provisions were part of a larger legislative compromise. Wisconsin clearly has an interest in policing its public utilities to protect the welfare of ratepayers. The existence of a holding company creates the opportunity and incentive for deceptive practices such as cross-subsidization from the regulated public utility to a non-regulated subsidiary. It is not surprising that when Wisconsin finally decided to authorize the existence of public utility holding companies they accompanied that authorization with statutory provisions allowing for government control of the financial structure and activities of such companies. It is not at all clear that Wisconsin would have authorized the formation of public utility holding companies had it not been for these protective controls. It therefore appears improper to sever the structural provisions from § 196.795(2).

The fact that the structural provisions are probably not severable from § 196.795(2) suggests that the reasoning

of *Fahey* would apply to estop Alliant here. On the other hand, Alliant argues that if a holding company is not allowed to challenge the provisions then they might go unchallenged because prospective entrants to the holding company market would have difficulty establishing standing to sue. Though we question whether Alliant's standing argument is persuasive, we need not resolve the issue today, because, as discussed below, we conclude that even if Alliant can challenge the structural provisions the challenge must fail.

As to the in-state incorporation provision, we conclude that Alliant is not estopped. Again we begin with the presumption of severability. The defendants have provided no rationale for why this provision should be inextricably tied to § 196.795(2). In fact, as will be shown later, the defendants cannot provide any rationale for the existence of this statute. As the provision serves no valid legislative purpose, it is difficult to see why Wisconsin would have made its inclusion an integral condition in the legislative compromise to allow public utility holding companies. The defendants have shown no evidence that Wisconsin would not have authorized the formation of public utility holding companies in the absence of the in-state incorporation provision, nor have they provided any logical explanation for why a State would want to condition the authorization of public holding companies on an in-state incorporation requirement.

As far as we can tell, and as far as the defendants' argument leads us, the provision was tacked on as an insurance measure in case the structural provisions could not stand on their own. Since those provisions can stand on their own, the insurance measure is unnecessary. The result would be quite ironic if defendants were right and the in-state incorporation provision was non-severable: the non-severable provision, inserted to protect the constitutionality of the statute, would threaten the

constitutionality of the entire statute, which otherwise has no constitutional failings at all. We therefore hold the in-state incorporation provision to be severable from the rest of the statutory provisions. That being the case, Alliant is not estopped from pursuing its challenge to the constitutionality of the provision.

Finally, as to § 196.53, the defendants do not argue that Alliant, or WPLC, is estopped from challenging this provision. There is little or no connection between that provision and the authorization of public utility holding companies. § 196.53 prohibits the granting or transferring of a public utility license, permit or franchise to a foreign corporation. This deals with the actual provision of the utility and not the financial structure of the utility holding company. Alliant is not estopped from challenging § 196.53.

### b. Commerce Clause Analysis

While the Commerce Clause, U.S. CONST. art. I § 8, cl. 3, explicitly grants Congress the authority to regulate commerce among the States, it has long been understood that it also directly limits the power of the States to discriminate against or burden interstate commerce. *Gov't Suppliers Consol. Servs., Inc. v. Bayh*, 975 F.2d 1267, 1276 (7th Cir. 1992); *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of the State of Oregon*, 511 U.S. 93, 98 (1994). This "negative" aspect of the Commerce Clause is often referred to as the "Dormant Commerce Clause" and is invoked to invalidate overreaching provisions of state regulation of commerce. If a party seeking to invalidate a statute cannot show any burden on interstate commerce, then the Dormant Commerce Clause is not implicated and the statute will not be invalidated. For those cases where interstate commerce is burdened, the Supreme Court has adopted "what amounts to a two-tiered approach" to

determining the validity of the statute. *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578 (1986). The first tier is often referred to as the "virtual *per se*" rule. This rule is applied when a statute "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests." *Id.* at 579. In such cases the Court has "generally struck down the statute without further inquiry." *Id.* The only thing that can save a statute under this analysis is a showing by the State that the law "advances a legitimate local purpose that cannot adequately be served by reasonable nondiscriminatory alternatives." *Oregon Waste Sys.*, 511 U.S. at 100-01 (internal quotations and citations omitted). But this showing must "pass the strictest scrutiny" and "[t]he State's burden of justification is so heavy that facial discrimination by itself may be a fatal defect." *Id.* (internal quotations and citations omitted).

The second tier is for cases where a statute "has only indirect or incidental effects on interstate commerce and regulates evenhandedly"; in such cases "the statute will be upheld 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Gov't Suppliers*, 975 F.2d at 1277 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)). This test has become known as the *Pike* balancing test. In determining which tier to apply, the rule of thumb is that essentially any statute that facially discriminates against out-of-state commerce will fall subject to the *per se* rule, and all other statutes that have an effect on interstate commerce will be analyzed under the *Pike* balancing test. Nonetheless, the Court has "recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach." *Brown-Forman Distillers*, 476 U.S. at

579. "In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.*

With this framework in mind we turn now to the three categories of statutory provisions challenged by Alliant.

### i. In-State Incorporation of Holding Company

It is important to understand that the requirement that the holding company be incorporated in-state must be analyzed separately and distinctly from the §196.53 requirement that a licence, permit or franchise to operate as a utility company only be granted or transferred to a Wisconsin corporation. The source of this distinction is the difference in kind between the commerce being regulated by each provision. The provision of public utilities within Wisconsin is intrastate commerce.[5] An investment opportunity in a Wisconsin utility is, on the other hand, an article of interstate commerce. *Cf. Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27 (1980). If ownership of a Wisconsin utility company must lie with a Wisconsin Corporation, a potential article of interstate commerce, i.e., the investment in the utility, is stopped at the border.

---

[5] Of course, if a utility were provided to Wisconsin users from an out-of-state source—by this we mean that the generation facilities are located out-of-state, not the corporate entity—that would be interstate commerce. *See Middle South Energy, Inc. v. Arkansas Pub. Serv. Comm'n*, 772 F.2d 404 (8th Cir. 1985). Likewise, if a facility located in Wisconsin were providing a utility to users in other States, that too would be interstate commerce. *See New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982). Such provision of utilities is controlled by federal regulation and presumably exempted by the terms of § 196.53; and in any event such scenarios are beyond the scope of this appeal.

Section 196.53 simply says that if you are going to produce an article of commerce within Wisconsin and sell it within Wisconsin then Wisconsin has the right to regulate your activities, whereas the in-state incorporation provision says that an article of commerce produced in Wisconsin is prohibited from being sold anywhere other than Wisconsin. This is a fundamental distinction. *See Eli Lilly & Co. v. Sav-On-Drugs Inc,* 366 U.S. 276 (1961).

Not only is it clear that the in-state incorporation provision regulates interstate commerce, but that the burdens produced by that regulation could be substantial. The requirement that a holding company be incorporated in Wisconsin requires that ultimate ownership lie in a Wisconsin corporation. To comply with this requirement a corporation could not just create a subsidiary; instead it would have to reincorporate the parent corporation in Wisconsin. If every State adopted this rule there would be no interstate investment in public utilities at all. No holding company parent could own public utility companies in more than one State. Section 196.53 in contrast does not create this balkanization between the States because a foreign company that wants to get involved in Wisconsin utility provision need only create a subsidiary and incorporate it in Wisconsin.

Determining that the Wisconsin provision burdens interstate commerce is only the beginning of the analysis. We must then apply either the rule of virtual *per se* invalidity or the *Pike* balancing test. The parties disagree about which tier of analysis should be applied to this provision. We think that the provision falls under the *per se* rule, but it is not necessary for us to make this determination as the provision is clearly invalid under the *Pike* test. *See Lewis*, 447 U.S. at 42 (not deciding whether legislation is *per se* invalid when the Court was convinced that the legislation was invalid under the balancing test); *Bendix Autolite Corp. v. Midwesco Enter., Inc.*, 486

U.S. 888, 891 (1988) (choosing to conduct a *Pike* balancing even where the statute "might have been held to be a discrimination that invalidates without extended inquiry").

The Supreme Court applied the *Pike* balancing test to invalidate a nearly identical statute in *Lewis*. The only difference in that case was the type of holding company. There the statute prohibited out-of-state holding companies from owning companies in Florida that sold investment advisory services; here the statute prohibits out-of-state holding companies from owning companies in Wisconsin that provide public utilities. The defendants argue that this distinction is dispositive. They essentially argue that the importance of local regulation of public utilities creates an exemption from normal Commerce Clause analysis. We do not question the importance of regulating public utilities and surely we should take the importance of public utilities into account in balancing the burdens on interstate commerce against the local benefits of the regulation; nonetheless, the importance of such regulation does not trump Commerce Clause analysis. In *Lewis* the Supreme Court noted the importance of local regulation of investment practices: "[F]inancial practices are essential to the health of any State's economy and to the well-being of its people." *Lewis,* 447 U.S. at 38. Still the Court conducted a full Commerce Clause inquiry. The Court explained that just because local regulation is important "it does not follow that these same activities lack important interstate attributes." *Id.* Important regulations that burden interstate activities are just as subject to Commerce Clause analysis as any other regulations.

As we apply the *Pike* balancing test, we note that the defendants have given us no legitimate local benefits to balance against the burden on interstate commerce. While they have told us that regulating public utilities is important, they have failed to provide any argument to show that

the in-state incorporation provision contributes to any meaningful regulatory scheme. The only rationale the defendants provide to save the in-state incorporation provision is the argument that in-state incorporation is necessary to save the constitutionality of the structural provisions. The defendants want us to assume that the structural provisions, standing alone, are unconstitutional. Of course, they attempt to refute this same proposition later when arguing for the constitutionality of the structural provisions themselves; but for the meantime they want us to accept the assumption. If the structural provisions are unconstitutional, the defendants argue, it is only because without in-state incorporation they affect the structure and financial activities of out-of-state holding companies. Recognizing this assumed constitutional weakness, Wisconsin has circumvented the problem by requiring that all holding companies be incorporated in Wisconsin. The in-state incorporation requirement, the argument goes, although otherwise unconstitutional is therefore saved by the fact that it is itself necessary to save the structural provisions, thus promoting regulation of the financial activities and structure of local utilities. One unconstitutional provision combines with another unconstitutional provision to create a constitutionally valid scheme. We have serious reservations as to the merits of this sort of constitutional bootstrapping. But the structural provisions, as we discuss below, are fully valid. And beyond the above argument of the defendants, they have provided no alternative rationale for us to consider. Given the validity of the structural provisions, the stated purpose of the in-state incorporation provision is moot: there is no need for an otherwise unconstitutional provision to save the constitutionality of an otherwise constitutional provision. This makes any balancing under *Pike* fairly effortless: no legitimate local interest has been presented to justify the burden the in-state incorporation provision has on interstate commerce.

The fact that Wisconsin could have prohibited the existence of any holding company outright does not change the outcome. A State may prohibit the local production of certain commerce, but as soon as such commerce is produced the State may not prevent it from crossing state lines. The landfill cases provide an example. States may choose not to zone land for dumping, but once the land is opened up for trash it must be opened up for all refuse, no matter where it originates. *See, e.g.*, *Oregon Waste Sys.*, 511 U.S. 93; *City of Philadelphia v. New Jersey,* 437 U.S. 617 (1978). The same is true of all items of commerce, including investment opportunities such as ownership in a public utility company.

### ii. Section 196.53

Alliant, through its subsidiary WPLC, challenges WIS. STAT. § 196.53, which provides, in relevant part, as follows:

> No license, permit or franchise to own, operate, manage or control any plant or equipment for the production, transmission, delivery or furnishing of heat, light, water or power may be granted or transferred to a foreign corporation.

It is not exactly clear what Alliant is challenging with respect to this provision. A cite to the statutory provision doesn't even show up in their opening brief's list of authorities, although it miraculously appears as one of the most cited provisions in their reply brief. Alliant's argument seems to be that whatever logic applies to the in-state incorporation provision must also apply to § 196.53. That cannot be the case. The in-state incorporation provision, requiring that a holding company be incorporated in Wisconsin, deals with *inter*state financial transactions whereas § 196.53 deals with *intra*state provision of public utilities—this distinction was discussed more extensively above. Other than this piggybacking of arguments, we glean

from the briefs and the record that Alliant claims that § 196.53, in prohibiting the "transfer" of licenses, permits or franchises to foreign corporations, precludes WPLC from selling any of its utility assets to a foreign corporation. This result occurs because the assets are useless without the license, permit or franchise to operate a public utility within Wisconsin. Alliant is not challenging the statutes prohibition on "granting" the licenses, permits or franchises to a foreign corporation.[6] Nonetheless, a holding that invalidates the prohibition on "transferring" would render the prohibition on "granting" practically meaningless—a foreign corporation seeking to provide public utilities within Wisconsin could simply enlist a Wisconsin corporation to transfer to it the permit, license or franchise to provide the utility. Wisconsin's purpose of keeping public utilities incorporated in-state would be unprotected and the only thing keeping foreign corporations from providing the utility would be a relatively small transaction. As such we must view Alliant's challenge to §196.53 as one to the entire provision—a challenge that asks us to invalidate Wisconsin's prohibition both on granting and on transferring licenses, permits or franchises for Wisconsin public utilities to foreign corporations.

The position is a dramatic one that would alter significantly the present law of utility regulation. For similar and longstanding statutes see N.H. REV. STAT. ANN. § 374:24 and OHIO REV. CODE ANN. § 4905.62. One would have expected a more comprehensive argument when a party is asking a court to so conclude. We are unpersuaded by Alliant's challenge. The provision of public utilities that are generated, distributed, and consumed in

---

[6] They would likely lack standing to directly challenge that aspect of § 196.53.

Wisconsin is an inherently local and intrastate business.[7] It is well-established that a State is free to regulate commerce that is intrastate in nature. *See Eli Lilly,* 366 U.S. 276; *Union Brokerage Co. v. Jensen*, 322 U.S. 202, 211 (1944); *Ry. Express Agency, Inc. v. Virginia*, 282 U.S. 440 (1931); *Kansas City Structural Steel Co. v. Arkansas*, 269 U.S. 148 (1925). Furthermore, the fact that an entity is involved both in intra- and interstate commerce does not exempt that entity from compliance with the intrastate regulations. *Eli Lilly*, 366 U.S. at 279 ("Lilly could not escape state regulation merely because it is also engaged in interstate commerce."). Thus, even if WPLC provided electricity both intrastate to Wisconsin users and interstate to foreign users, this would not constitutionally exempt it from local regulation of its intrastate operations.

The Supreme Court has left unanswered the question of whether this approach allows a State to require local incorporation as a condition of doing business in local markets. *Lewis*, 447 U.S. at 50-51; *but see Railway Express*, 282 U.S. at 444 (State may require a foreign corporation to take out a local charter prior to being granted a permit to conduct local business). In addressing this question under the *Pike* balancing test we can assume, because Alliant has not argued otherwise, that a local incorporation requirement has a minimal burden on *inter*state commerce and serves a legitimate and important state

---

[7] If Alliant is instead resting their challenge on the notion that §196.53 is unconstitutional because it prohibits foreign corporations from using WPLC's assets for *inter*state generation and transmission of power—generating the power in Wisconsin and shipping it out, or using WPLC's distribution lines to bring in power generated outside of Wisconsin—they have not presented this argument in their briefs. And it is not clear that the statute even has such an affect, or that Alliant would have standing to bring that challenge.

interest in regulating *intra*state commerce. *Cf. Eli Lilly,* 366 U.S. at 279 (legitimate state interest served by re-quirement of certificate of authority to do business as a prerequisite to participation in intrastate commerce); *Union Brokerage,* 322 U.S. at 211 (same). At best Alliant's implied argument, if there is one, boils down to a claim that by requiring local incorporation of intrastate business Wis-consin is burdening interstate commerce in the assets of intrastate business. Such a position is not sustainable. If a piece of equipment is only useful in providing a utility in Wisconsin, the sale of the equipment is not an inter-state transaction, even if the buyer is a foreign corpora-tion. If WPLC sells a power plant located in and im-moveable from Wisconsin to any buyer, that is an intrastate transaction. No item of commerce crosses state-lines. The sale of a piece of moveable equipment that might be useful outside of Wisconsin is of course interstate commerce; but Alliant has not argued that such a sale is affected by § 196.53. Ultimately, Alliant has shown no excessive burden on interstate commerce and explained no reason why a State cannot require local incorporation as a condition of doing local business in local markets. Based on these sparse arguments we cannot conclude that §196.53 vio-lates the Constitution.

### iii.  *Structural Provisions*

The remaining provisions (the takeover provision, the asset cap, and the securities regulations provisions) regu-late the financial structure and activities of a holding company that owns a Wisconsin utility. None of these provisions discriminates on its face against out-of-state economic interests. All three treat in-state activity equally with out-of-state activity: the asset cap limits a utility holding company's ownership of non-utility assets regard-less of where those assets are located; the takeover provi-

sion requires PSC approval prior to the sale of more than 10% of the holding company's stock no matter where the involved parties are located or incorporated; and the securities regulation provisions likewise require approval of the PSC prior to issuance of securities by a public service corporation without regard to whether the securities are entering into interstate commerce. None of the provisions imposes a burden on interstate commerce that they do not impose on intrastate commerce as well. But these provisions do all have effects on interstate commerce. In fact, given the invalidation of the in-state incorporation provision, some transactions regulated by these provisions may occur entirely outside of Wisconsin. For example, an Illinois corporation that owns a Wisconsin utility would be subject to Wisconsin regulation if it wished to sell 10% of its stock to an Indiana corporation or if it decided to diversify and purchase non-utility assets located in various States that amounted to greater than 25% of its worth. Such transactions are no doubt interstate in nature. *See Edgar v. Mite Corp.*, 457 U.S. 624 (1982).

Provisions like these, that are facially neutral but indirectly burden interstate commerce, must be analyzed under the *Pike* balancing test. Alliant argues that no such balancing is necessary because the provisions burden extraterritorial commerce. We have no doubt that the provisions do in fact impact extraterritorial commerce (see our examples above); but we disagree with the proposition that this renders the provisions *per se* invalid. To support its argument Alliant directs our attention to the opinion of Justice White in *Edgar v. Mite*. In that case, where the majority of the Court struck down an Illinois statute requiring registration and approval of the Secretary of State of Illinois for any tender offer involving a corporation in which Illinois residents own 10% of the stock, Justice White wrote: "[I]f Illinois may impose such

regulations, so may other States; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled." *Id.* at 642. Justice White went on to note: "The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Id.* at 642-43. This language, if controlling, would mean victory for Alliant; the only problem is that the language, appearing in part V-A of Justice White's opinion, did not draw support from a majority of the Court and is therefore not the opinion of the Court.[8]

In part V-B, which did garner the support of a majority of the Court, Justice White applied the *Pike* test to the Illinois statute, and therefore we do the same for the Wisconsin provision in question here. *Id.* 643-46; *see also Southern Union Co. v. Missouri Pub. Serv. Comm'n*, 289 F.3d 503 (8th Cir. 2002) (rejecting the plaintiffs *per se* claim and applying the balancing test to provisions regulating the financial activities of public utilities). The burden on one side is, as we have stated, the effect the statute has on interstate financial transactions. This is no small impact. Certain interstate financial transactions of non-Wisconsin parties are subject to approval of the PSC while other such transactions are banned outright. This places a high, sometimes prohibitive, transactions cost on these dealings. *Cf. Mite*, 457 U.S. at 643 ("The effects of allowing the Illinois Secretary of State to block a nationwide tender offer are substantial."). The benefit on the other side is the regulation of local public utilities. This is

---

[8] Justice White delivered a five part opinion, with Part V separated into V-A and V-B. The Justices split along many different lines, and in the end only Parts I, II and V-B received support from a majority of the Court—different majorities as to each part.

an important interest. *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."); *accord Southern Union,* 289 F.3d at 509; *Baltimore Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1424 (4th Cir. 1985). This interest is served well by the structural provisions because they help to prevent such abuses as cross-subsidization and deceptive reporting of cost allocation. Cross-subsidization occurs when a firm uses the revenues from the sale of one product to subsidize the sale of a another product. In a free-market system cross-subsidizing is not profit-maximizing and there are few incentives to do it. But regulation can distort free market incentives. The cost allocation and cross-subsidy problem can be illustrated by the following example. A firm sells products X and Y, where the market for X is regulated and the market for Y is unregulated. The regulation on X provides that a firm can charge a price that results in a fixed rate-of-return on its capital investment in X. Profits are dictated as a percentage of capital investment. The larger the investment in X, the greater profit the firm is authorized to collect. The price of Y is determined by free-market forces and not directly affected by the cost of capital investments. The firm has an incentive to allocate as much of its costs as possible as capital investments in the production of X. A less-than-honest firm may report certain costs attributable to product Y as investments in product X. Thus the consumers of product X cross-subsidize product Y by paying—through the regulated rate-of-return pricing—part of the costs in producing Y. The more products a firm is responsible for, the easier it is for the firm to misreport the allocation of its costs. This danger can be tempered by limiting the public utility holding company's involvement with and ownership of businesses and assets unrelated to providing the public utility. *See, e.g.*, *Southern Union*, 289 F.3d at 507-08

("Rate regulation is a complex process. A public utility's investments in other companies can affect its regulated rate of return, if investment losses are allocated to the regulated business.").

In arguing that the balancing proves invalidity here, Alliant again points to *Edgar v. Mite*—this time to part V-B where the majority invalidated the statute in question because Illinois had no interest in regulating the internal affairs of foreign corporations and "[i]nsofar as the Illinois law burdens out-of-state transactions, there is nothing to be weighed in the balance to sustain the law." 457 U.S. at 644. This was true because the law affected the sale and purchase of stocks that might never involve any Illinois shareholders. The Court also noted that where the law did apply to transactions involving Illinois shareholders, the Court was "unconvinced that the Illinois Act substantially enhances the shareholders' positions." *Id.*

The V-B analysis in *Edgar v. Mite* can be distinguished from the instant case. Wisconsin has a strong interest—namely the protection of the welfare of ratepayers—to be weighed against the burden the statute places on interstate trade. The need to prevent abuses made possible by the presence of a holding company is extremely important and imperative for the proper functioning of any regulatory scheme. The dangers inherent in the mere existence of utility holding companies render a great need for structural regulation of those companies. A State is entitled to regulate the financial structure and investments of companies that control utilities in that State; otherwise it would lose considerable power to police the rates charged for the provision of utility service. The burden on interstate commerce, however significant it may be, is not enough to outweigh this interest.

We are not alone in this assessment. The Eighth and Fourth Circuits have both found this interest to be of

sufficient importance to outweigh the burden similar provisions placed on interstate commerce. The Eighth Circuit in *Southern Union*, applied the *Pike* test and upheld a law that required approval by the Missouri Public Service Commission before any utility doing business in Missouri purchased stocks or bonds issued by another utility because the importance of regulating utilities and ratepayer welfare outweighed the burden placed on extraterritorial interstate stock transactions. *Southern Union*, 289 F.3d at 503. A similar analysis and outcome were reached in the Fourth Circuit in *Baltimore Gas & Electric* where the challenged statute prohibited non-public service corporations from acquiring more than 10% of a Maryland public utility, and required that even public service corporations seek approval before acquiring 10% of a Maryland public utility. 760 F.2d 1408. The court applied the *Pike* test and upheld the statute because of the importance of preventing deceptive practices inherently available to utility holding companies. *Id.* In conducting the balancing test the court recognized that "[a] necessary adjunct to ensuring the protection of consumers is the authority to regulate the corporate structure of public utilities" and that

> holding companies provide the occasion for deceptive financing practices, nondisclosure of important corporate accounts, and the manipulation of various "service charges" by the holding companies which increase the utility's costs and the ultimate charge to the consumer.

*Id.* at 1424-25.

Alliant also argues that these structural provisions are invalid because they are redundant of other regulations. These other regulations are laws that prohibit deceptive practices. This argument must fail. A State is serving a legitimate purpose when it passes structural regulations to

serve as a back up to prohibitions. The Fourth Circuit explained in *Baltimore Gas & Electric*:

> That the state has enacted a complex regulatory structure with overlapping provisions, more than one of which may serve ultimately to control suspect activity, does not vitiate the state's otherwise legitimate interest in curbing such suspect activity. The state may regulate the rates utilities charge consumers either directly, by requiring commission approval of rate increase, or indirectly, by controlling certain investments and attempts at diversification by the utility. That is, the state may choose one or more means to a particular end, and the legitimacy of the end—the state interest served by the particular regulation—is not vitiated when the state chooses several means of achieving that end.

760 F.2d at 1425.

We therefore conclude that the structural provisions in question pass the *Pike* test.

### c. *Equal Protection Analysis*

The Equal Protection question is obviously moot for the in-state incorporation provision, which we have already found unconstitutional under the Commerce Clause analysis. As for the other provisions, the Equal Protection analysis would require a rational basis test. If Wisconsin can show that the provisions are rationally related to a legitimate state interest, then the provisions do not violate the Equal Protection Clause. In our Commerce Clause analysis, we have already held that the provisions serve a legitimate state interest. Therefore the Commerce Clause analysis answers the Equal Protection question as well. The structural provisions and § 196.53 do not violate the Equal Protection Clause.

### III.  Conclusion

For the foregoing reasons we conclude that WIS. STAT. § 196.795(5)(L), the in-state incorporation provision, violates the Commerce Clause of the Constitution; that the arguments presented by Alliant regarding WIS. STAT. § 196.53, the provision prohibiting the transfers of licenses, permits and franchises to foreign corporations, do not establish that § 196.53, as applied to WPLC, is unconstitutional; and finally that the remaining provisions— § 196.795(3) (the takeover provision), § 196.795(6m)(b) (the asset cap), and §§ 196.195(5)(a) and (7)(a), 201.01(2), and 201.03(1) (the securities regulation provisions)—do not violate the Constitution. Accordingly, we REVERSE the district court's grant of the defendants' motion for summary judgment and denial of the plaintiff's motion for summary judgment with regard to WIS. STAT.§ 196.795(5)(L), and AFFIRM the district court's grant of the defendants' motion for summary judgment and denial of the plaintiff's motion for summary judgment with regard to all other challenged provisions and this case is REMANDED for further proceedings consistent with this opinion.

A true Copy:

  Teste:

        ———————————————————

        *Clerk of the United States Court of*
          *Appeals for the Seventh Circuit*