# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-2156
No. 14-2251

_____

State of North Dakota, et al.

*Plaintiffs - Appellees/Cross Appellants*

v.

Beverly Heydinger, Chair, Minnesota Public Utilities Commission, et al.

*Defendants - Appellants/Cross Appellees*

------------------------------

American Wind Energy Association, et al.

*Amici on Behalf of Appellants*

American Coalition for Clean Coal Electricity, et al.

*Amici on Behalf of Appellees*

_____

Appeals from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 21, 2015
Filed: June 15, 2016

_____

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

A 2007 Minnesota statute provides that "no person shall . . . (2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or (3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3(2) and (3). The State of North Dakota, three non-profit cooperative entities that provide electric power to rural and municipal utilities in Minnesota, and others brought this action against the Commissioners of the Minnesota Public Utilities Commission ("MPUC") and the Minnesota Department of Commerce ("MDOC") (collectively, "the State"). Plaintiffs claimed, *inter alia*, that these prohibitions violate the Commerce Clause. After extensive submissions and argument, the district court[1] granted plaintiffs summary judgment and a permanent injunction, concluding that the above-quoted provisions are "impermissible extraterritorial legislation" and therefore "a per se violation of the dormant Commerce Clause." North Dakota v. Heydinger, 15 F. Supp. 3d 891, 919 (D. Minn. 2014). The State appeals. We affirm.

## I. Background.

To light and heat our homes and offices, electric power must be generated from an energy source, such as fossil and nuclear fuels, sun, and wind; transmitted over high voltage transmission lines from generating facilities to distribution stations; and delivered to individual consumers over local, low voltage distribution lines. An electric utility may engage in any or all of these activities.

_____

[1] The Honorable Susan Richard Nelson, United States District Judge for the District of Minnesota.

The Federal Power Act, enacted in 1935, responded to a Supreme Court decision that the Commerce Clause bars the States from regulating certain interstate electricity transactions. Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co., 273 U.S. 83, 89 (1927). To fill this gap, Congress granted the Federal Power Commission, now the Federal Energy Regulatory Commission ("FERC"), jurisdiction over "the transmission of electric energy in interstate commerce and . . . the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). The Act left to the States most matters they had traditionally regulated, including local electric utility rates and the siting of power plants, see § 824(a) and (b), subject to limits imposed by the Commerce Clause. See New York v. FERC, 535 U.S. 1, 19-23 (2002); New Eng. Power Co. v. New Hampshire, 455 U.S. 331, 340-41 (1982).

It proved difficult to bring electricity efficiently and cost effectively to rural areas, and to municipalities that have publicly-owned distribution systems. To address this problem, small local utilities formed large cooperative entities having sufficient capital to build captive generation and transmission facilities and to leverage local members' buying power in an increasingly integrated electric power market. Three of these cooperative entities are a principal focus in this case, Basin Electric Cooperative ("Basin"); Minnkota Power Cooperative, Inc. ("Minnkota"); and Missouri River Energy Services ("MRES"). Headquartered in North Dakota, Basin has 135 rural electric cooperative members spread across nine States, including twelve in Minnesota. Basin owns its own generation and transmission resources and enters into power purchase agreements with other generation and transmission utilities. Minnkota is a regional generation and transmission utility based in North Dakota that provides electric power to its members, who are distribution cooperatives in North Dakota and Minnesota, including various Indian reservations. Located in South Dakota, MRES provides power to more than sixty municipalities in Minnesota and three other States.

Technology has substantially changed the electric power industry since 1935, reducing the cost of generating and transmitting electricity and enabling new entrants to challenge the generating monopolies of traditional utilities. See Morgan Stanley Capital Grp. v. Pub. Util. Dist. No. 1, 554 U.S. 527, 535-36 (2008). To encourage "robust competition in the wholesale electricity market," FERC encouraged utilities participating in regional transmission grids to create independent system operators ("ISOs") and regional transmission organizations ("RTOs"), entities that "would assume operational control -- but not ownership -- of the transmission facilities owned by its member utilities [and] then provide open access to the regional transmission system to all electricity generators at rates established in a single . . . tariff that applies to all eligible users." Midwest ISO Transmission Owners v. FERC, 373 F.3d 1361, 1364 (D.C. Cir. 2004) (quotation omitted); see 18 C.F.R. § 35.34(a). Today, these regional organizations control most of the nation's transmission grid. FERC v. Elec. Power Supply Ass'n, 136 S. Ct. 760, 768 (2016).

Basin, Minnkota, and MRES are members of the Midcontinent Independent Transmission System Operator ("MISO"), an ISO established in 1998 and approved by FERC as the first RTO in 2001. MISO controls over 49,000 miles of transmission lines, a grid that spans fifteen States, including Minnesota, and parts of Canada. See Midwest ISO, 373 F.3d at 1365. Its thirty transmission-owning members include investor-owned utilities, public power utilities, independent power producers, and rural electric cooperatives. In Minnesota, most retail distribution utilities, now referred to as load-serving entities or "LSEs," see 16 U.S.C. § 824q(a)(2), are either members of MISO or non-members who participate in its energy markets.

FERC requires that an approved RTO such as MISO has operational authority for all transmission facilities under its control, be the only provider of transmission services over those facilities, and have sole authority to approve or deny all requests for transmission service. "Thus, whatever its structure, once a utility [makes] the decision to surrender operational control of its transmission facilities to [MISO], any

-4-

transmissions across those facilities [are] subject to the control of [MISO]." <u>Midwest ISO</u>, 373 F.3d at 1365. The Supreme Court recently explained how an RTO such as MISO efficiently allocates the supply and demand for electric power:

> [RTOs] obtain (1) orders from LSEs indicating how much electricity they need at various times and (2) bids from generators specifying how much electricity they can produce at those times and how much they will charge for it. [RTOs] accept the generators' bids in order of cost (least expensive first) until they satisfy the LSEs' total demand. The price of the last unit of electricity purchased is then paid to every supplier whose bid was accepted, regardless of its actual offer; and the total cost is split among the LSEs in proportion to how much energy they have ordered.

<u>Elec. Power Supply</u>, 136 S. Ct. at 768. MISO generators commit their electricity to be sold to the MISO market; LSE buyers take electricity out of the market without regard to its generation source. MISO -- not individual generators -- controls which generation facilities operate at any given time. Though utilities still enter into bilateral purchase agreements as a way to meet their reserve capacity requirements,[2] "any electricity that enters the grid immediately becomes a part of a vast pool of energy that is constantly moving in interstate commerce." <u>New York</u>, 535 U.S. at 7.

The Minnesota statute at issue is part of the Next Generation Energy Act ("NGEA"), a statute intended to reduce "statewide power sector carbon dioxide emissions" by prohibiting utilities from meeting Minnesota demand with electricity

---

[2]"'Capacity' is not electricity itself but the ability to produce it when necessary." <u>Conn. DPUC v. FERC</u>, 569 F.3d 477, 479 (D.C. Cir. 2009), <u>cert. denied</u>, 558 U.S. 1110 (2010). To ensure system reliability, MISO maintains a systemwide installed capacity reserve and requires each LSE to have control, through ownership or purchase, of sufficient capacity to meet its peak load plus a reserve. FERC and state utility regulators have overlapping, at times conflicting, jurisdiction to impose and monitor capacity requirements. <u>Id.</u> at 481-84. Basin conducts this planning on a region-wide basis.

generated by a "new large energy facility" in a transaction that will contribute to or increase "statewide power sector carbon dioxide emissions." The statute regulates "the total annual emissions of carbon dioxide from the generation of electricity within the state and all emissions of carbon dioxide from the generation of electricity imported from outside of the state and consumed in Minnesota." Minn. Stat. § 216H.03, subd. 2. The challenged prohibitions in § 216H.03, subd. 3(2) and (3), are enforced by MPUC and MDOC. When either agency determines that "any person is violating or about to violate [§ 216H.03], it may refer the matter to the attorney general who shall take appropriate legal action." Id., subd. 8.

Since NGEA enactment, MDOC and MPUC have declined to clarify how these prohibitions apply to electricity transmitted under MISO's control. As the district court explained, Heydinger, 15 F. Supp. 3d at 899-903, plaintiffs submitted extensive evidence describing the impact the prohibitions have on their obligations to meet region-wide demand for electric power:

(i) Dairyland Power Cooperative ("Dairyland") is a Wisconsin generation and transmission cooperative that sells wholesale electricity through the MISO market to LSE members scattered across several states, including Minnesota. Dairyland is part-owner of a coal-fired plant, Weston 4, located in central Wisconsin. In a 2011 administrative proceeding, MDOC at the urging of environmental groups took the position that § 216H.03 restricts Dairyland's ability to rely on electricity generated by Weston 4 to serve its Minnesota members. Dairyland noted that MISO was responsible for dispatching all electricity Dairyland generates. MDOC nonetheless took the position that Weston 4 is a "new large energy facility" subject to the NGEA unless an exemption applied. MDOC explained:

> In sum, Dairyland must meet the resource needs of its system as [a] whole. Regardless of whether that analysis takes into account MISO purchases, sales, dispatch, or constraints, Dairyland does not separately plan for its Minnesota and Wisconsin load. Thus, 1) all of Dairyland's generation is dispatched for the benefit of Dairyland's entire membership, 2) all members will share in the benefits of any MISO energy sales, and 3) all members will bear responsibility for any MISO purchases. In other words, all of Dairyland's members are part of the same system.

After nearly a year of enforcement proceedings, MPUC concluded that Weston 4 fell within the NGEA exemption for new large facilities that were under MPUC consideration before April 1, 2007. See § 216H.03, subd. 7(1).

(ii) In early 2012, Basin notified the State that it was transmitting electricity from "Dry Forks," a Wyoming coal-fired plant, to meet increased demand in the booming North Dakota "oil patch," a transmission that brought electric power into the Eastern Interconnection and subject to MISO's control. MDOC asked Basin for analysis of "whether that provision of power to MISO was a violation of Minnesota Statutes § 216H.03." After Basin responded, neither MPUC nor MDOC answered Basin's request for confirmation whether this transmission violated § 216H.03, subd. 3. Plaintiffs submitted declarations by Basin officers that Basin is apprehensive about entering into long-term power purchase agreements to serve non-Minnesota load due to § 216H.03, which interferes with Basin's ability to make investment decisions such as its planned development of a coal-fired plant in Selby, South Dakota.

(iii) Minnkota has increasing surplus capacity from its partially-owned coal-fired plant in North Dakota. Concerned that this will trigger NGEA enforcement, two LSE members in Minnesota have declined to enter into long-term purchase agreements with Minnkota. (iv) MRES declined to purchase capacity from a coal-

fired facility in Wisconsin after determining the transaction would be viewed by the State as violating the NGEA.

The district court concluded that (i) plaintiffs have standing to challenge Minn. Stat. § 216H.03, subd. 3(2) and (3), under the Commerce Clause, and the issue is ripe for judicial review; (ii) the court would not abstain from deciding the Commerce Clause issue; (iii) the Commerce Clause extraterritoriality doctrine is not limited to price-control statutes; and (iv) § 216H.03, subd. 3(2) and (3), unambiguously apply to transactions outside Minnesota that place energy in the MISO market and therefore unconstitutionally compel out-of-state cooperatives to conduct their out-of-state business according to Minnesota's terms because they cannot ensure that out-of-state coal-generated electricity they inject into the MISO grid will not be used to serve their Minnesota members. Heydinger, 15 F. Supp. 3d at 904-18. On appeal, the State and its supporting amici challenge each of those rulings.

## II. Standing and Ripeness.

**A. Standing.** Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." To establish an Article III case or controversy, a plaintiff must show it has suffered an injury in fact fairly traceable to the challenged conduct that will likely be redressed by a favorable decision. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). When a statute is alleged to violate the Commerce Clause, plaintiffs have standing if the law "has a direct negative effect on their borrowing power, financial strength, and fiscal planning." Jones v. Gale, 470 F.3d 1261, 1267 (8th Cir. 2006), cert. denied, 549 U.S. 1328 (2007), quoting S.D. Farm Bureau, Inc. v. Hazeltine, 340 F.3d 583, 592 (8th Cir. 2003), cert. denied, 541 U.S. 1037 (2004). The district court determined that at least three plaintiffs have standing -- Basin, MRES, and Minnkota. Heydinger, 15 F. Supp.

-8-

3d at 905-06 & n.8. Plaintiffs meet the Article III standing requirement if we conclude, reviewing the issue *de novo*, that at least one of these plaintiffs has standing to sue. See Jones, 470 F.3d at 1265.

As the district court concluded, the summary judgment record clearly establishes that the prohibitions in § 216H.03, subd. 3(2) and (3), are interfering with Basin's ability to transmit power and enter into power purchase agreements occurring entirely outside Minnesota. Basin's concern that the statute will prohibit or sharply curtail its out-of-state transactions is well-grounded in the statute's plain text and is reinforced by the position taken by MDOC in the Dairyland proceeding and by MPUC questioning whether Basin's Dry Forks transfer violated § 216H.03 and then intentionally leaving the question unanswered. This is probable economic injury resulting from governmental action that satisfies Article III's injury-in-fact requirement. See Clinton v. New York, 524 U.S. 417, 433 (1998). On this record, the State's assertion that there is no real threat of enforcement because MDOC and MPUC do not intend to enforce the prohibitions based on transactions in the MISO markets is not credible.

**B. Ripeness.** The State argues the district court erred in concluding that plaintiffs' claims are ripe for judicial review. Heydinger, 15 F. Supp. 3d at 906. The ripeness doctrine is aimed at preventing federal courts, through "premature adjudication, from entangling themselves in abstract disagreements." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967). A party seeking federal review must show "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149. Both factors must exist "to at least a minimal degree." Neb. Pub. Power Dist. v. MidAm. Energy Co., 234 F.3d 1032, 1039 (8th Cir. 2000).

Reviewing this issue *de novo*, we agree with the district court that plaintiffs' claims are ripe for judicial review. See Parrish v. Dayton, 761 F.3d 873, 875 (8th Cir. 2014) (standard of review). The challenge is fit for review because the issues are predominately legal, and the challenged prohibitions are *currently* causing hardship by interfering with the ability of plaintiffs such as Basin to plan, invest in, and conduct their business operations. Delaying judicial resolution would force these plaintiffs "to gamble millions of dollars on an uncertain legal foundation." Neb. Pub. Power, 234 F.3d at 1039. It also risks harm to all citizens in the region served by MISO by preventing or discouraging the development of electric power capacity needed to meet their demands. See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201-02 (1983). In our view, given this potentially "disastrous impact," the uncertainty regarding how MDOC and MPUC will enforce these prohibitions confirms that the claims are ripe for review. Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 172 (1967).

### III. Abstention.

The State argues the district court should have declined to decide this case under the abstention doctrine established in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941). "Pullman requires a federal court to refrain from exercising jurisdiction when the case involves a potentially controlling issue of state law that is unclear, and the decision of this issue by the state courts could avoid or materially alter the need for a decision on federal constitutional grounds." Moe v. Brookings Cty., 659 F.2d 880, 883 (8th Cir. 1981). The district court declined to abstain because "Minn. Stat. § 216H.03 is not sufficiently ambiguous, and because there is no possibility that the state law determination will moot the federal constitutional question." Heydinger, 15 F. Supp. 3d at 907. We review this ruling

-10-

for abuse of discretion.  See Nat'l City Lines, Inc. v. LLC Corp., 687 F.2d 1122, 1126 (8th Cir. 1982) (standard of review).

The State argues that whether the prohibitions in § 216H.03, subd. 3(2) and (3), apply to transactions in the MISO energy markets is unclear, and therefore "it would be appropriate to abstain so that the MPUC can issue a formal interpretation as part of an administrative proceeding."  But in the context here, this is insufficient reason for the district court to decline its "virtually unflagging obligation" to exercise federal jurisdiction.  Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).  In the first place, the State has had years to "issue a formal interpretation" and has intentionally not done so.  MDOC declined to rule or even opine on the constitutionality of § 216H.03 in the Dairyland proceeding, and MPUC failed to answer Basin's request for a ruling whether the statute applied to Basin's transfer of electricity from the Dry Forks plant into the MISO markets.

Of equal significance, the State has failed to put forth a plausible limiting interpretation of § 216H.03, subd. 3(2) and (3), that would "moot the federal constitutional question."  The repeated assertions in the State's briefs that the prohibitions do not apply "to the MISO short-term energy markets" are contrary to the plain meaning of the statute; moreover, they do not answer whether the statute nonetheless impacts transactions by out-of-state MISO members to obtain adequate electric power capacity for the region.  In this situation, "[i]f the statute is not obviously susceptible of a limiting construction, then even if the statute has never been interpreted by a state tribunal it is the duty of the federal court to exercise its properly invoked jurisdiction."  City of Houston v. Hill, 482 U.S. 451, 468 (1987) (quotation and alteration omitted); see Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n, 772 F.2d 404, 418 (8th Cir. 1985), cert. denied, 474 U.S. 1102 (1986).

# IV. The Commerce Clause Merits.

The Commerce Clause grants to Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Although the Clause does not expressly limit the States' ability to regulate commerce, the Supreme Court has interpreted it as including a "'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." Healy v. Beer Inst., 491 U.S. 324, 326 n.1 (1989). A state statute that discriminates against interstate commerce in favor of in-state commerce is usually a per se violation of this constitutional limitation. Likewise, a statute that has the practical effect of exerting extraterritorial control over "commerce that takes place wholly outside of the State's borders" is likely to be invalid per se. Id. at 336. Beyond those limitations, a statute will run afoul of the Commerce Clause as construed in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), if it imposes an undue burden on interstate commerce that outweighs its local benefits. See generally Hazeltine, 340 F.3d at 593; Cotto Waxo Co. v. Williams, 46 F.3d 790, 793 (8th Cir. 1995).

The Supreme Court has applied the extraterritoriality doctrine in relatively few cases. The "critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." Healy, 491 U.S. at 336 (quotation and citations omitted); see Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 582 (1986); Edgar v. MITE Corp., 457 U.S. 624, 643 (1982); Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 521 (1935). A state statute has undue extraterritorial reach and "is per se invalid" when it "requires people or businesses to conduct their out-of-state commerce in a certain way." Cotto Waxo, 46 F.3d at 793. The State argues the district court erred in ruling that "§ 216H.03, subd. 3(2)-(3), violates the extraterritoriality doctrine and is per se invalid." Heydinger, 15

F. Supp. 3d at 910, 916-19.  We review this issue of law *de novo*.  See S. Union Co. v. Mo. Pub. Serv. Comm'n, 289 F.3d 503, 505 (8th Cir. 2002).

1.  The State and its supporting amici argue that only price-control and price-affirmation laws can violate the extraterritoriality doctrine, an argument that would seemingly insulate all environmental prohibitions from this Commerce Clause scrutiny.  This categorical approach to the Commerce Clause would be contrary to well-established Supreme Court jurisprudence.  See W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 201 (1994) ("Our Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce."); cf. Ill. Commerce Comm'n v. FERC, 721 F.3d 764, 776 (7th Cir. 2013), cert. denied, 134 S. Ct. 1277 (2014) ("Michigan cannot, without violating the commerce clause . . . discriminate against out-of-state renewable energy.").

The district court correctly noted the Supreme Court has never so limited the doctrine, and indeed has applied it more broadly.  Heydinger, 15 F. Supp. 3d at 911. In Edgar v. MITE Corp., the Court invalidated the Illinois Business Take-Over Act; a plurality ruled the Act invalid in part because of its "sweeping extraterritorial effect."  457 U.S. 624, 642 (1982).[3]  We have twice applied the doctrine outside the price-control context.  See S. Union, 289 F.3d at 507; Cotto Waxo, 46 F.3d at 793-94. Our sister circuits have considered whether a variety of non-price laws were unconstitutionally extraterritorial.  See, e.g., Am. Beverage Ass'n v. Snyder, 735 F.3d 362, 366 (6th Cir.), cert. denied, 134 S. Ct. 61 (2013); Am. Booksellers Found. v. Dean, 342 F.3d 96, 100, 103-04 (2d Cir. 2003); Nat'l Solid Wastes Mgmt. Ass'n v. Meyer, 63 F.3d 652, 659-60 (7th Cir. 1995), cert. denied, 517 U.S. 1119 ( 1996).

---

[3]Though that portion of Edgar was a plurality opinion, the majority in Healy described Edgar as a decision that "significantly illuminates the contours of the constitutional prohibition on extraterritorial legislation."  491 U.S. at 333 n.9.

A panel of the Tenth Circuit recently took a somewhat contrary position in Energy & Environment Legal Institute v. Epel, 793 F.3d 1169 (10th Cir.), cert. denied, 136 S. Ct. 595 (2015). At issue was the validity of a Colorado statute requiring "electricity generators to ensure that 20% of the electricity they sell to Colorado consumers comes from renewable sources." Id. at 1170. In upholding the law, the court ruled that "non-price standards for products sold in-state" may be amenable to Commerce Clause scrutiny under the Pike balancing test, or "for traces of discrimination" in favor of in-state commerce, but they do not warrant "near automatic condemnation" under the extraterritoriality doctrine. Id. at 1173. *Whether a state statute with extraterritorial effect should be deemed "per se invalid," or should be analyzed under the Pike balancing test, is a difficult issue we have not previously addressed.* In this case the State has not argued that the district court erred in applying the per se standard, as opposed to the Pike balancing test.[4]

2. The State primarily argues that the prohibitions in § 216H.03, subd. 3(2) and (3), do not apply to the "MISO short-term energy markets" and therefore do not violate the extraterritoriality doctrine. The State contends that the statute regulates only "contracts or other commitments to import electricity in the future" and the "persons who contract with a generating facility to import electricity into Minnesota for use by Minnesota customers." By contrast, the MISO markets are for *short-term* energy and thus do not implicate the NGEA prohibition on *long-term* power purchase agreements. Thus, the statute as the State would have us read it leaves non-Minnesota entities free to transact business with other non-Minnesota entities.

---

[4]The extraterritorial effect alleged in Epel -- "some out-of-state coal producers . . . will lose [Colorado] business," 793 F.3d at 1171 -- is different than the effect that invalidates Minn. Stat. § 216H.03, subd. 3(2) and (3).

The district court concluded that this contention is contrary to the plain language of the statute. Heydinger, 15 F. Supp. 3d at 908-10. Subdivision 2 of § 216H.03 expressly defines "statewide power sector carbon dioxide emissions" as including emissions from the generation of electricity that is "imported from outside the state and consumed in Minnesota." Clause (2) of subdivision 3 provides that "no person" shall "import or commit to import" power from a large new energy facility located "outside the state," a command plainly encompassing both present and future transactions.[5] Clause (3) prohibits entering into a new long-term power purchase agreement "that would increase emissions" from an out-of-state generating facility, whether presently existing or not. These broad prohibitions plainly encompass non-Minnesota entities and transactions. The presumption against extraterritoriality does not apply when the statute's text is clear. Cotto Waxo, 46 F.3d at 792-93.

Not only do the challenged prohibitions apply to non-Minnesota utilities, they regulate activity and transactions taking place *wholly outside* of Minnesota. In the regional MISO transmission grid, a person who "imports" electricity does not know the origin of the electrons it receives, whether or not the transaction is pursuant to a long-term purchase agreement with an out-of-state generator. As a State expert described the energy market, the "contract path" between the importer and generator "represents a flow of dollars, not a flow of electrons." In the MISO grid, electrons flow freely without regard to state borders, entirely under MISO's control. Thus, when a non-Minnesota generating utility injects electricity into the MISO grid to meet its commitments to *non*-Minnesota customers, it cannot ensure that those electrons will not flow into and be consumed in Minnesota. Likewise, non-Minnesota utilities that enter into power purchase agreements to serve *non*-Minnesota members cannot guarantee that the electricity eventually bid into the MISO markets pursuant to those

---

[5]The word "import" means "to bring in from a foreign or external source: introduce from without." Webster's Third New International Dictionary 1135 (1986).

agreements will not be imported into and consumed in Minnesota. As MDOC observed in the Dairyland proceeding, "it is impossible to determine that no electrons from a generation unit reach a particular end-use customer, unless the generation resource and end-use customer are completely disconnected from each other physically." Thus, generators such as Basin, Minnkota, and MRES cannot prevent energy they place in the MISO grid to serve *non*-Minnesota customers from being imported into Minnesota, and a Minnesota LSE cannot do business with those out-of-state generators without "importing" electrons from their coal-fired facilities.

Like persons who post information on an out-of-state internet website, out-of-state utilities entering into purchases and sales of electricity in the MISO transmission grid "cannot prevent [electricity users in Minnesota] from accessing the [electrons]." Am. Booksellers, 342 F.3d at 103. And the statute provides that all MISO participants must comply with the challenged prohibitions any time they enter into a transaction or agreement that may "import" electricity into Minnesota. To avoid this direct impact on activities and transactions that are otherwise entirely out-of-state commerce, integrated regional utilities like Basin must either unplug from MISO or seek regulatory approval from MDOC and MPUC. "Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." Brown-Forman, 476 U.S. at 582. For this reason, the district court correctly concluded that the challenged prohibitions have "the practical effect of controlling conduct beyond the boundaries of" Minnesota. Cotto Waxo, 46 F.3d at 793.[6]

---

[6]This case is unlike cases where the regulated out-of-state entities had the physical ability to segregate products bound for the regulating State from products bound for other States. See Rocky Mountain Farmers Union v. Corey, 730 F.3d 1070, 1102-03 (9th Cir. 2013), cert. denied, 134 S. Ct. 2875 (2014) (ethanol); Int'l Dairy Foods Ass'n v. Boggs, 622 F.3d 628, 646-47 (6th Cir. 2010) (dairy products);

The State argues that "§ 216H.03 merely regulates in an area of traditional state authority." Without question, Minnesota and other States have long regulated the siting, construction, and operation of electric generating facilities located within their borders. See Minn. Stat. §§ 216B.243, 216B.24; S. Union, 289 F.3d at 507. Minnesota "retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources." Maine v. Taylor, 477 U.S. 131, 151 (1986). Consistent with that authority, plaintiffs did not challenge, and the district court did not enjoin, enforcement of § 216H.03, subd. 3(1), which prohibits constructing within Minnesota a new large energy facility that would contribute to statewide carbon dioxide emissions.

But unlike Clause (1), Clauses (2) and (3) of § 216H.03, subd. 3, seek to reduce emissions that occur outside Minnesota by prohibiting transactions that originate outside Minnesota. And their practical effect is to control activities taking place *wholly* outside Minnesota. In determining whether a law has extraterritorial reach, the Supreme Court has instructed us to consider "how the challenged statute may interact with the legitimate regulatory regimes of other States." Healy, 491 U.S. at 336. Other States in the MISO region have not adopted Minnesota's policy of increasing the cost of electricity by restricting use of the currently most cost-efficient sources of generating capacity. Yet the challenged statute will impose that policy on neighboring States by preventing MISO members from adding capacity from prohibited sources anywhere in the grid, absent Minnesota regulatory approval or the

SPGGC, LLC v. Blumenthal, 505 F.3d 183, 195-96 (2d Cir. 2007) (prepaid gift cards); Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 110 (2d Cir. 2001), cert. denied, 536 U.S. 905 (2003) (lamps); Hampton Feedlot, Inc. v. Nixon, 249 F.3d 814, 819 (8th Cir. 2001) (livestock); Cotto Waxo, 46 F.3d at 793 (petroleum-based sweeping compounds).

dismantling of the federally encouraged and approved MISO transmission system. This Minnesota may not do without the approval of Congress.

## V. Remaining Issues.

The district court enjoined the defendant state officials "from enforcing Minn. Stat. § 216H.03, subd. 3(2)-(3)." Heydinger, 15 F. Supp. 3d at 919. The State argues an injunction was improper because plaintiffs did not "establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). But this standard does not apply to extraterritorial challenges under the Commerce Clause. The State has not cited a Supreme Court decision applying the Salerno standard to a facial Commerce Clause challenge. And in Healy, a facial extraterritoriality challenge, Salerno was not even cited in the Court's majority, concurring, or dissenting opinions. 491 U.S. at 324-49.

The State further argues that the injunction "should have been limited to what was necessary to cure the supposed extraterritorial reach." But the State fails to put forth a more limited alternative injunction. Given the overbroad prohibitions in § 216H.03, subd. 3(2) and (3), it would be inappropriate to speculate as to what narrower prohibitions would be free of improper extraterritorial effect yet would achieve a significant part of the statute's apparent purpose. In these circumstances, the district court did not abuse its discretion by simply enjoining enforcement of the two invalid subsections of § 216H.03, subd. 3, leaving Minnesota to craft an alternative.

In its summary judgment order, the district court declined to award plaintiffs attorneys' fees. Heydinger, 15 F. Supp. 3d at 919. Plaintiffs cross-appealed that ruling. While their cross-appeal was pending, the district court ruled that they *are*

entitled to recover fees but did not determine the amount to be awarded. North Dakota v. Heydinger, No. 11-CV-3232, 2014 WL 7157013, at *1-2 & n.1 (D. Minn. Dec. 15, 2014). Accordingly, we dismiss the cross-appeal as moot. See In re Rodriquez, 258 F.3d 757, 759 (8th Cir. 2001) ("If, while an appeal is pending, an event occurs that eliminates the court's ability to provide any effectual relief whatever, the appeal must be dismissed as moot.").

The judgment of the district court is affirmed.

MURPHY, Circuit Judge, concurring in part and concurring in the judgment.

I respectfully disagree with Judge Loken's extraterritoriality analysis. The challenged provisions in the Next Generation Energy Act would regulate entities outside Minnesota only if those entities "import" electric power into Minnesota or enter into power purchase agreements that result in power being imported into Minnesota. These provisions would not regulate commerce "that takes place wholly outside of [Minnesota's] borders." For these reasons I disagree with Judge Loken's conclusion that the provisions have an unconstitutional extraterritorial effect. See Healy v. Beer Inst., 491 U.S. 324, 336–37 (1989).

The district court's injunction should nonetheless be affirmed because both of the challenged statutory provisions are preempted by the Federal Power Act. That act gives the Federal Energy Regulatory Commission exclusive jurisdiction to regulate wholesale sales and the transmission of electric energy in interstate commerce. See New York v. FERC, 535 U.S. 1, 6–7 (2002).

The Constitution gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. Art. I, § 8, cl. 3. That power also has a "negative or dormant implication," which "prohibits state taxation or regulation that discriminates or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997) (citations omitted). Under the dormant Commerce Clause, a statute faces strict scrutiny and is almost always invalid if it "discriminates against interstate commerce." Dept. of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008). If the law is nondiscriminatory and "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). One line of Supreme Court cases has invalidated statutes which have an impermissible extraterritorial effect by "controlling commercial activity occurring wholly outside the boundary of the State." Healy, 491 U.S. at 337. The critical inquiry in these cases "is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." Id. at 336.

The Minnesota statute at issue before us provides that "no person shall:"

(1) construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions;
(2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

(3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions.

Minn. Stat. § 216H.03, subd. 3. The phrase "statewide power sector carbon dioxide emissions" is defined as the total carbon dioxide emissions "from the generation of electricity within the state" and "from the generation of electricity imported from outside the state and consumed in Minnesota." Id. subd. 2.

The two challenged statutory provisions apply to companies which are engaged in commerce which enters into Minnesota. Clause (2) applies to entities that "import" power "from outside the state." Id. subd. 3. The power purchase agreement provision in clause (3) applies to entities which enter into agreements that increase Minnesota's carbon emissions from electricity generation in Minnesota or from generation of electricity "imported from outside the state and consumed in Minnesota." See id. subds. 2–3. These provisions do not allow Minnesota to regulate transactions that occur "wholly outside" the state.

Judge Loken relies on incorrect assumptions to conclude that the statute operates extraterritorially because it applies to all events occurring anywhere on the MISO grid (Midcontinent Independent System Operator). In his view the statute regulates flows of electrons because a generating facility outside Minnesota which "injects electricity into the MISO grid . . . cannot ensure that those electrons will not flow into and be consumed in Minnesota." Experts have pointed out, however, that electrons do not behave like drops of water flowing through a pipe, for this "is not how electricity works." Brief of Electrical Engineers et al. as Amici Curiae Supporting Respondents, New York v. FERC (No. 00-568), 2001 WL 605124 at *6 ("Brief of Electrical Engineers"), cited in New York, 535 U.S. at 7 n.5. "Water pipe

metaphors for the transmission of electricity are popular, but misleading." Id. (citation omitted).

In the electricity transmission system, individual electrons do not actually "flow" in the same sense as water in a pipe. Id. at *6–7. Rather, the electrons oscillate in place, and it is electric energy which is transmitted through the propagation of an electromagnetic wave. Id. Electricity on the grid behaves according to the laws of physics, and it cannot be dispatched from one particular place to another. Id. at *8–9. "Energy flowing onto a power grid energizes the entire grid, and consumers then draw undifferentiated energy from that grid." Id. at *9.

How the grid actually works is important because in interpreting a Minnesota statute we presume that the legislature did "not intend a result that is absurd, impossible of execution, or unreasonable." Minn. Stat. § 645.17(1). For example, if a coal power plant in Arkansas were to bid its generation into the MISO market and be requested by MISO to generate power, that coal plant would not inject electrons into the grid to "flow into and be consumed in Minnesota" as suggested by Judge Loken, even though Minnesota utilities were simultaneously drawing power from the grid. The actual flows of power are unpredictable, uncontrollable, and untraceable. Brief of Electrical Engineers at *2, 15–16. Because the energized grid behaves as an undifferentiated electromagnetic wave, and there is no way to trace the flows of electric power on the grid from generators to local distribution substations. Thus, it would be impossible for the Minnesota Attorney General to enforce the statute as Judge Loken envisions. See id. The State concedes as much in its brief where it states that it "could not enforce" the import provision against transactions in the MISO short term energy markets. Interpreting the import provision to apply to all new power plants in MISO (or elsewhere as appellees contend) is therefore not reasonable.

A sounder reading of the text is that the import provision in the statute applies to bilateral contracts in which a Minnesota utility agrees to purchase power from a new large energy facility out of state. The language in the statute supports this interpretation because it creates exemptions for certain "contract[s]" entered into before 2007 "to purchase power from [an approved] new large energy facility" and for power purchase agreements "between a Minnesota utility and [an approved] new large energy facility located outside Minnesota." Minn. Stat. § 216H.03, subd. 7(2)–(3). This interpretation avoids making the statute "impossible of execution." See Minn. Stat. § 645.17(1).

To be sure, the statute is ambiguous as to exactly which actions would "import" power from outside the state. Our duty in such a situation is to adopt a reasonable construction of the statute which avoids the constitutional problems in the statutory interpretation by the appellants. See Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec., 738 F.3d 885, 892–93 (8th Cir. 2013). We presume the Minnesota legislature did not intend its statute to be interpreted in a manner which raises serious constitutional questions. See Clark v. Martinez, 543 U.S. 371, 381–82 (2005). We also presume that Minnesota laws do not apply extraterritorially. See Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255 (2010); In re Pratt, 18 N.W.2d 147, 153 (Minn. 1945).

Judge Loken contends that the presumption against extraterritoriality does not apply here because the statute's text clearly provides for extraterritorial applications. I disagree. Although the statute covers power plants outside Minnesota which enter into contracts with utilities within the state, that does not mean it controls commerce occurring wholly outside the state. A state may subject out of state companies to its laws when they enter into commerce within the state without violating any extraterritoriality principle. See, e.g., Pharm. Research & Mfrs. of Am. v. Walsh, 538

-23-

U.S. 644, 669–70 (2003) (rejecting extraterritoriality challenge to Maine's prescription rebate program brought by out of state drug manufacturers).

In Cotto Waxo Co. v. Williams, 46 F.3d 790 (8th Cir. 1995), our court explained the distinction between wholly extraterritorial regulation and regulations which apply to out of state companies entering into commerce within a state. In Cotto Waxo, an out of state manufacturer was forced to stop selling its products in Minnesota after the latter's legislature issued a ban on them. The company contended that the Minnesota law was invalid because it prevented "an out-of-state manufacturer from selling its product to out-of-state retailers and end users." Id. at 793. We explained that Cotto Waxo had "misapprehend[ed] the meaning of extraterritorial reach," which refers to statutes that "necessarily require[] out-of-state commerce to be conducted according to in-state terms." Id. at 793–94. Although the Minnesota law "[c]learly . . . affected Cotto Waxo's participation in interstate commerce," its effect was not unconstitutionally extraterritorial because it was "indifferent to sales occurring out-of-state" and Cotto Waxo was "able to sell to out-of-state purchasers regardless of [its] relationship to Minnesota." Id. at 794.

In this case like in Cotto Waxo, the text of the import provision bars contracts between generators and utilities in Minnesota, but allows the generators to contract freely with utilities outside Minnesota. See 46 F.3d at 793–94. It therefore does not control conduct wholly outside Minnesota. See id. Compare Quik Payday, Inc. v. Stork, 549 F.3d 1302, 1308 (10th Cir. 2008) (rejecting extraterritoriality challenge to enforcement of Kansas's payday lending law against internet lender based in Utah making loans to Kansans located in their home state), and State ex rel. Swanson v. Integrity Advance, LLC, 870 N.W.2d 90, 95–96 (Minn. 2015) (rejecting extraterritoriality challenge to Minnesota's payday lending law by Delaware internet lender), with Midwest Title Loans, Inc. v. Mills, 593 F.3d 660, 669 (7th Cir. 2010)

(invalidating Indiana lending law as applied to an Illinois company lending to Indiana residents using contracts which were made and executed entirely in Illinois).

The text of this Minnesota statute indicates that the import provision does not cover activity which occurs "wholly outside" the state, Healy, 491 U.S. at 336, and the State reasonably construes this statute as having no application to transactions on the MISO market. I therefore respectfully disagree with Judge Loken's conclusion that the challenged provisions operate extraterritorially.

II.

This case can be resolved by a preemption analysis that avoids the complex issues surrounding an application of the extraterritoriality doctrine to the electricity markets, because both challenged statutory provisions are preempted by the Federal Power Act (FPA). See Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). The FPA gives exclusive jurisdiction to the Federal Energy Regulatory Commission (FERC) over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." New York, 535 U.S. at 6–7; 16 U.S.C. § 824(b)(1). The act distinguishes between wholesale sales among electric power generators and utilities, which are regulated by FERC, and retail sales of electricity by load serving entities who purchase power at wholesale and resell it to end users. See FERC v. Electric Power Supply Ass'n (EPSA), 577 U.S. ___, ___, 136 S. Ct. 760, 767–68 (2016).

The import provision in the Minnesota statute covers transactions which "import or commit to import from outside the state power from a new large energy facility." Minn. Stat. § 216H.03, subd. 3(2). Since the import provision bans contracts for power from new large power plants, it thus bans wholesale sales of

-25-

electric energy in interstate commerce.  The FPA "'leaves no room either for direct state regulation of the prices of interstate wholesales' or for regulation that 'would indirectly achieve the same result.'"  EPSA, 577 U.S. at ___, 136 S. Ct. at 780 (quoting Northern Natural Gas Co. v. State Corp. Comm'n of Kan., 372 U.S. 84, 91 (1963)).  The FPA therefore preempts the import provision.

Appellants contend that the import provision in this statute is not preempted because it relates to a traditional area of state regulation not covered by the FPA.  FERC has recognized that the states retain authority under the FPA to regulate in "traditional areas" such as the "administration of integrated resource planning and utility buy-side and demand-side decisions" and "utility generation and resource portfolios."  See New York, 535 U.S. at 24 (quoting FERC Order 888).  The import provision in this statute, however, does not fall into any of those categories.  Unlike those state laws, the import provision here directly bans certain wholesale sales.

The transactions covered by the power purchase agreement provision (which are contracts for 50 megawatts or more of capacity) are wholesale transactions.  See Minn. Stat. § 216H.03, subd. 3(3).[7]  These agreements cover capacity on the national electricity grid and are thus made "in interstate commerce."  See EPSA, 577 U.S. at ___, 136 S. Ct. at 768; New York, 535 U.S. at 17.  FERC has jurisdiction to regulate certain parameters of the capacity market, and "the price of capacity is indisputably a matter within the Commission's exclusive jurisdiction."  New England Power Generators Ass'n, Inc. v. FERC, 757 F.3d 283, 290 (D.C. Cir. 2014); cf. Hughes v. Talen Energy Mktg., LLC, 578 U.S. ___, No.14-614, slip op. at 11-15 (Apr. 19, 2016)

---

[7]In the electricity markets "capacity" is the ability to produce electric power when necessary.  Utilities purchase capacity from electric power generators to ensure they can obtain enough power during peaks in electricity demand.  See Conn. Dep't of Pub. Util. Control v. FERC, 569 F.3d 477, 479 (D.C. Cir. 2009).

(discussing FERC regulation of capacity markets). Minnesota's ban on certain capacity contracts directly conflicts with FERC's jurisdiction. The power purchase agreement provision is thus also preempted by the FPA.

I agree with Judge Loken that we have jurisdiction and concur in the judgment, but I disagree with Judge Loken's extraterritoriality analysis and would instead affirm the district court's injunction because both of the challenged provisions are preempted by the FPA.

COLLOTON, Circuit Judge, concurring in the judgment.

The plaintiffs in this case challenge the validity of Minnesota statute § 216H.03, subd. 3(2) and (3) on three grounds. They contend that the statute is preempted by the Federal Power Act, 16 U.S.C. § 824, *et seq.*, preempted by the Clean Air Act, 42 U.S.C. § 7401, *et seq.*, and unconstitutional under the "dormant" Commerce Clause. The district court accepted the latter contention and permanently enjoined Minnesota from enforcing the statutory provisions. I agree that the plaintiffs have standing to sue and that the dispute is ripe for resolution.

Although the district court did not address whether the Minnesota statute is preempted by one or both of the federal statutes, we should consider that question first. According to the Supreme Court, a preemption claim "is treated as 'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications." *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 271-72 (1977); *accord Ariz. Dream Act Coalition v. Brewer*, No. 15-15307, 2016 WL 1358378, at *9 (9th Cir. Apr. 5, 2016); *C.E.R. 1988, Inc. v. Aetna Cas. & Sur. Co.*, 386 F.3d 263, 272 n.13 (3d Cir. 2004). If federal law preempts the Minnesota statute,

then it is unnecessary to address whether the statute violates a dormant limitation implied from the Commerce Clause.

The parties dispute the scope of the Minnesota statute. The plaintiffs urge a broad interpretation under which the statute regulates activity occurring entirely outside Minnesota. The State favors a narrower construction that applies only to bilateral contracts in which a Minnesota entity agrees to purchase power from an out-of-state energy provider. It is unnecessary to resolve that dispute (or to decide whether the question should be addressed first by the state courts, *see R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941)), because even under the State's narrower view, the Minnesota statute is preempted by federal law.

Insofar as the Minnesota statute bans wholesale sales of electric energy in interstate commerce, I agree with Part II of Judge Murphy's opinion that the statute is preempted by the Federal Power Act. The Federal Energy Regulatory Commission has exclusive jurisdiction over the interstate wholesale market for electricity, including wholesale rates. *See Hughes v. Talen Energy Mkg.*, 136 S. Ct. 1288, 1297 (2016). Because a State may not regulate wholesale rates, it follows that a State may not impose a complete ban on wholesale sales, effectively forbidding the parties to arrive at *any* mutually agreeable price.

The Minnesota statute by its terms, however, does not constitute a complete ban on wholesale sales of energy that contribute to or increase statewide power sector carbon dioxide emissions. Subdivision 3 contains general prohibitions, but subdivision 4 establishes exceptions: If a "project proponent" demonstrates that it will "offset the new contribution" to emissions by reducing an existing facility's emissions or by purchasing carbon dioxide allowances, or by a combination of both, then the prohibitions of subdivision 3 do not apply. The statute, therefore, permits

a project proponent to conduct transactions otherwise prohibited by subdivision 3 if it meets the offset requirements. For example, in a proceeding concerning a new coal-fired plant of Great River Energy in North Dakota that would be used in part to serve Minnesota customers, the Minnesota Public Utilities Commission solicited comment on a carbon offset proposal to reduce emissions at other facilities that Great River Energy operated in North Dakota. SA 261. The State contends that a North Dakota entity also could satisfy the offset provision by purchasing carbon dioxide allowances from California or northeastern States.

Minnesota's effort to require an out-of-state entity to comply with the statute's offset provision conflicts with the Clean Air Act. The Clean Air Act regulates emissions through a cooperative federalism approach. The Act grants the Environmental Protection Agency authority to establish baseline standards, including limits on emissions. 42 U.S.C. §§ 7408, 7409. It then calls for each State to develop a State Implementation Plan to regulate stationary sources within its boundaries. §§ 7407, 7410(a)(1). Each State's plan must include "control measures, means, or techniques," such as "enforceable emission limitations" or "marketable permits," to meet the Act's requirements. § 7410(a)(2)(A). States are permitted to employ emissions standards more stringent than those specified by the federal requirements. § 7416.

Each State is granted "primary responsibility for assuring air quality within [its] entire geographic region." § 7407(a); *see also* § 7401(a)(3). The Act is designed so that each operator of a pollution source need look to only one sovereign—the State in which the source is located—for rules governing emissions. "[A]llowing 'a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states.'"

*N.C., ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301 (4th Cir. 2010) (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496-97 (1987)).

The offset requirements of the Minnesota statute encroach on the source State's authority to govern emissions from sources within its borders. If other States in the region enacted laws similar to the Minnesota statute, then an energy facility could be required to comply with multiple varying emissions requirements in order to sell wholesale energy through the MISO market. By demanding offsets or allowance purchases from a North Dakota energy facility as a condition for contracting to provide power to Minnesota customers, Minnesota's statute conflicts with the regulatory scheme that Congress designed in the Clean Air Act. If Minnesota has concerns with emissions from its neighbors, then it may seek recourse through one of the Act's several mechanisms by which affected States may challenge emissions from source States. *See* 42 U.S.C. § 7426; *Tenn. Valley Auth.*, 615 F.3d at 310-11.

For these reasons, the challenged provisions of Minnesota law, Minn. Stat. § 216H.03, subd. 3(2) and (3), are preempted by federal law. I concur in the judgment affirming the district court's injunction and dismissing the cross-appeal as moot.

———————————————